# Ex. 1

| AOC-105 | Doc. Code: CI | | Case No. _10Ci 00977_ |
|---|---|---|---|
| Rev. 1-07 | 09/21/2010 04:21 PM | | Court  ☑ Circuit  ☐ District |
| Page 1 of 1 | Ver. 1.02 | CIVIL SUMMONS | County  Oldham ☑ |
| Commonwealth of Kentucky | | | |
| Court of Justice   www.courts.ky.gov | | | |
| CR 4.02; CR Official Form 1 | | | |

**PLAINTIFF**

THE CINCINNATI INSURANCE COMPANY

a/s/o Richard Sauer and Leila Davis

6200 South Gilmore Road

Fairfield                          Ohio               ☑  45014     5141

**VS.**

**DEFENDANT**

OMEGA FLEX, INC.

451 Creamery Way

Exton                             Pennsylvania        ☑  19341

**Service of Process Agent for Defendant:**

Corporation Service Company

2704 Commerce Drive

Harrisburg                                     Pennsylvania     ☑  17110

**THE COMMONWEALTH OF KENTUCKY**
**TO THE ABOVE-NAMED DEFENDANT(S):**

You are hereby notified a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within 20 days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached Complaint.

The name(s) and address(es) of the party or parties demanding relief against you are shown on the document delivered to you with this Summons.

Date: _09-21_, 2_010_                    _Linda G Mason_                  Clerk

By: _____  _Sm_ D.C.

---

**Proof of Service**

This Summons was served by delivering a true copy and the Complaint (or other initiating document) to:

_____

this _____ day of _____, 2_____.

Served by: _____

_____ Title

OLDHAM CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 10 ci 00977

THE CINCINNATI INSURANCE COMPANY
a/s/o Richard Sauer and Leila Davis
6200 South Gilmore Road
Fairfield, Ohio 45014-5141

vs.                                                **COMPLAINT**

OMEGA FLEX, INC.
451 Creamery Way
Exton, Pennsylvania 19341

\*        \*        \*        \*

Plaintiff, The Cincinnati Insurance Company, as subrogee of Richard Sauer and Leila

Davis, states by way of Complaint against the defendant as follows:

### THE PARTIES

1.      Plaintiff, The Cincinnati Insurance Company as subrogee of Richard Sauer and

Leila Davis (hereinafter "Cincinnati"), is an insurance company organized and existing under the

laws of the State of Ohio with its principal place of business located at 6200 South Gilmore Road

in Fairfield, Ohio.  At all times relevant hereto, Cincinnati was engaged in the business of

underwriting property and casualty insurance.

2.      At all times relevant hereto, Cincinnati provided insurance to Richard Sauer and

Leila Davis with regard to the building and personal property located at 1800 Rivercrest Drive in

Prospect, Kentucky.



FILED
SEP 21 2010
OLDHAM CIRCUIT/DISTRICT COURT
BY_____ D.C.

3.    Defendant, Omega Flex, Inc. (hereinafter "Omega Flex") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania having its principal place of business and a headquarters located in at 451 Creamery Way in Exton, Pennsylvania.

4.    At all times relevant hereto, Omega Flex was in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling corrugated stainless steel tubing (hereinafter "CSST") under the brand name "TracPipe".

## BACKGROUND

5.    At all times relevant hereto, Cincinnati insured Richard Sauer and Leila Davis, the building located at 1800 Rivercrest Drive in Prospect, Kentucky (hereinafter the "Property"), and the personal property located therein, pursuant to a policy of insurance, policy number H010331612 (hereinafter the "Policy").

6.    Prior to May 27, 2009, TracPipe brand CSST lines manufactured by defendant, Omega Flex, were installed at the Property.

7.    On or about May 27, 2009, lightning struck the property and caused a failure in a TracPipe brand CSST line manufactured by defendant, Omega Flex.

8.    The failure of the CSST gas line caused a fire that resulted in significant structural damage to the Property and caused significant fire, smoke and water damage to the personal property of Cincinnati's insureds.

9.    As a result of the May 27, 2009 fire, and pursuant to the terms and conditions of the Policy, Cincinnati made payments to or on behalf of its insureds totaling $847,614.77.

10.   As a result of the payments it made to its insureds, and pursuant to the terms and conditions of the Policy, the plaintiff is legally, equitably and contractually subrogated to the

rights of its insureds to the extent of such payments which exceed the jurisdictional minimum of this Court.

## COUNT I – STRICT LIABILITY

11.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 10 as if fully set forth herein at length.

12.     At all times relevant hereto, Omega Flex was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing and selling CSST piping including the TracPipe CSST piping installed at the Property.

13.     The CSST gas lines manufactured by the defendant were expected to and did reach plaintiff's insureds and the Property without substantial change in the condition in which they were designed, manufactured, tested, inspected, distributed, marketed or sold.

14.     The CSST gas lines as designed, manufactured, tested, inspected, distributed, marketed and sold by Omega Flex were in a defective condition and were defective when they left the possession of Omega Flex.

15.     A TracPipe CSST gas line, manufactured by the defendant, malfunctioned in that it failed, leaked gas and started the May 27, 2009 fire at issue.

16.     The CSST gas line failed in the course of its normal and intended use.

17.     At the time of the fire, plaintiff's insureds were utilizing the CSST gas line for the purposes and in the manner intended and/or reasonably anticipated by defendant, Omega Flex.

18.     Plaintiff's insureds could not, by the exercise of reasonable care, have discovered the defect(s) and/or deficienc(ies) herein mentioned and/or perceived the danger inherent in the CSST piping.

19.  Defendant, Omega Flex, while regularly engaged in the aforementioned business activities designed, manufactured, tested, inspected, distributed, marketed and sold the CSST gas line in a defective condition, unreasonably dangerous to the user or consumer in violation of Section 402A of the Restatement (Second) of Torts.

20.  Defendant, Omega Flex failed to warn plaintiff's insured and all foreseeable installers and users of the serious and foreseeable risk of harm posed by the defect(s) and/or deficienc(ies) in the CSST gas lines which caused the gas line at the Property to fail, leak gas and start a fire in the course of its normal and intended use.

21.  The May 27, 2009 fire was a direct and proximate result of the defective, unreasonably dangerous and unsafe condition of the CSST gas line described herein.

22.  As a result of the May 27, 2009 fire, and pursuant to the terms and conditions of the Policy, plaintiff made payments to its insureds to compensate them for their losses in an amount that exceeds the jurisdictional minimum of this Court.

23.  Pursuant to the terms and conditions of the Policy, and the payments it made to its insureds, plaintiff is legally, equitably and contractually subrogated to the rights of its insureds to the extent of such payments in an amount that exceeds the jurisdictional minimum of this Court.

## COUNT II – NEGLIGENCE

24.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 23 as if fully set forth at length

25.  At all times material hereto, defendant, Omega Flex, acted through its duly authorized agents, workmen, contractors, employees and/or other authorized representatives who were acting within the course and scope within their relationship, agency and/or employment.

26.     At all times relevant hereto, defendant, Omega Flex, had a duty to exercise reasonable care in connection with the design, manufacture, maintenance, assembly, inspection, testing, sale and/or distribution of its CSST gas lines and had a duty to exercise reasonable care to protect users of its products against the risk of fire.

27.     Defendant, Omega Flex, knew or had reason to know of the purpose for which its CSST gas lines were intended and further had reason to know a defect would cause the CSST gas lines to become inherently dangerous instrumentalities for users thereof.

28.     Defendant, Omega Flex, through the exercise of ordinary care, should have discovered and foreseen the dangerous and defective condition and potential problems with the CSST gas lines when it placed its products on the market for the sale to, and installation into the home of, plaintiff's insureds.

29.     Defendant, Omega Flex, breached the duties it owed to plaintiff's insureds.

30.     The May 27, 2009 fire and resulting damages were the direct and proximate result of the negligence, carelessness and negligent acts and/or omissions of defendant, Omega Flex.

31.     As a result of the negligent conduct of defendant, Omega Flex, plaintiff's insureds sustained substantial fire, smoke and water damage to their property for which they were compensated by plaintiff in an amount that exceeds the jurisdictional minimum of this Court.

32.     As a result of the payments it made to its insureds and pursuant to the terms and conditions of the Policy, plaintiff is legally, equitably and contractually subrogated to the rights of its insureds in an amount that exceeds the jurisdictional minimum of this Court.

WHEREFORE, plaintiff, The Cincinnati Insurance Company, as subrogee of Richard Sauer and Leila Davis, demands judgment in its favor and against defendant, Omega Flex, Inc. as follows:

1.    For compensatory damages in an amount to be established by a jury based upon the evidence presented at trial plus both pre-judgment and post-judgment interest at the legal rate in an amount that exceeds the jurisdictional minimum of this Court;

2.    For recovery of its costs to include reasonable attorney's fee, if applicable;

3.    For trial by jury on all issues so triable;

4.    For any and all other relief to which it may be entitled.

Respectfully submitted,

JOHN K. CARTER, ATTORNEY
2311 South Highway 53
P/O. Box 205
La Grange, Kentucky 40031
P:  (502) 225-0202
F:  (502) 222-6021

LAW OFFICES OF ROBERT A. STUTMAN P.C.

THOMAS UNDERWOOD JR.
20 East Taunton Rd., Suite 403
Berlin, NJ 08009
P:  (856) 767-6800 ext. 11
F:  (856) 767-6810

2016 SEP 27   AM 9: 06

# Ex. 2

From:                                           03/21/2011 05:37      #020 P.001/005

# OLDHAM COUNTY INSPECTIONS

Date 11/2/11    Exhibit # 9
Case Cinci Ins. V. Omega Flex
Deponent Gary Woods
Reporter Rose Mary Kithcart, RPR   CRS File # 22066
Court Reporting Services, Inc.
888.430.1521    FAX 502.899.7976

Sauer Docs 0269

From:                                              03/21/2011 05:42    #020 P.002/005

Building Information Viewer                                                    1


Fri Mar 18 13:57:54 EDT 2011

---

**SEARCH FOR APPLICATIONS**

**INFORMATION - APPLICATION# SF0415536**

Application Type   SF
Address   1800
          Mayo
          LN
Primary Applicant
          Blacketer Company

**Status**

Check Status
Change Status and Milestone
Application is Open.
Current milestone is C of 0.
Pay Fees
Current unpaid amount of $1,032.59.
Event Log: 0
Review All Events
Review All Log
Status Log: 1

**Application**
(Tab Not Loaded)

**Activities and Fees**

|  | |
|---|---|
|  | Pay Fees |
|  | Create Fee |
| Unpaid Fees | 1032.59 |
|  | Refund Fee |
| Paid Fees | 0.00 |
|  | Refund Overpayment |
|  | Transfer Overpayment |
| Deposit Paid | 0.00 |
|  | Refund Deposit |
|  | Review All Deposits |
| Overpayments | 0.00 |
| Deposit Balance | 0.00 |
|  | Clear Deposit |
| Paid At Cost Fees | 0.00 |
|  | Last Payment: #0 in the amount of $0.00. |
|  | Reverse Last Payment |
|  | Void Last Payment |
|  | Last Payment Status: |
|  | Review All Payments |
|  | Confirm Payment |
|  | Payments: 0 |
|  | Review All Conditions |
|  | Unapproved Condition(s): 0 |
|  | Return |
|  | Create Inspection |
|  | Review All Reviews |
|  | Create Review |
|  | Review(s) not recorded: 0 |
|  | Review All Planning Conditions |
|  | Add Planning Condition |
|  | Planning Condition(s) not met: 0 |

**Inspections**

| Inspection # | Inspection Type | # | Result | Result By | Assigned To | Call | Scheduled | Time Preference | Inspected By | Started | Completed | Location | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18356 | Footel | 1 | Approved | 20-1144 | | | | | 20-1144 | 5/6/2004 00:00 | 5/6/2004 00:00 | | |
| 18289 | Rough | 1 | Approved | 20-1144 | | | 9/13/2004 08:19 | | 20-1144 | 9/14/2004 15:12 | 9/14/2004 15:12 | | |
| 24777 | Final | 1 | Approved | 20-1144 | | 5/26/2005 11:05 | 6/30/2005 11:05 | | 20-1144 | | 7/1/2005 14:01 | | |

**Related CDR Applications**
(Tab Not Loaded)

**Maintenance**
(Tab Not Loaded)

---

Sauer Docs 0270

http://oc2/oldham1/print.htm                                          3/18/2011

From:                                          03/21/2011 05:42    #020 P.003/005

Building Information Viewer                                              1


People. Government. Solutions

Fri Mar 18 13:57:12 EDT 2011

---

SEARCH FOR APPLICATIONS

### INFORMATION - APPLICATION# EL0416582

*Application Type*  EL
*Address*  1800
Mayo
LN

*Primary Applicant*  Corrigan Electric

#### Status

Check Status
Change Status and Milestone
Application is Closed.
Application has been finalized on 9/13/2004 8:18:29 AM.
Pay Fees
Current unpaid amount of $0.00.
Event Log: 0
Review All Events
Review All Log
Status Log: 6

#### Application

(Tab Not Loaded)

#### Activities and Fees

Pay Fees
Create Fee
*Unpaid Fees*  0.00
Refund Fee
*Paid Fees*  150.00
Refund Overpayment
Transfer Overpayment
*Deposit Paid*  0.00
Refund Deposit
Review All Deposits
*Overpayments*  0.00
Clear Deposit
*Deposit Balance*  0.00
*Paid At Cost Fees*  0.00
Last Payment: #3979 in the amount of $25.00.
Reverse Last Payment
Void Last Payment
Last Payment Status: Paid
Review All Payments
Confirm Payment
Payments: 2
Review All Conditions
Unapproved Condition(s): 0
Return
Create Inspection
Review All Reviews
Create Review
Review(s) not recorded: 0
Review All Planning Conditions
Add Planning Condition
Planning Condition(s) not met: 0

#### Inspections

| Inspection # | Inspection Type | # | Result | Result Assigned By | To | Call | Scheduled | Time Preference | Inspected By | Started | Completed | Location | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18205 | TM | 1 | Approved | 20-1144 | | | 9/13/2004 08:17 | | 20-1144 | 9/14/2004 15:14 | 9/14/2004 15:14 | | |
| 18206 | Rough | 1 | Approved | 20-1144 | | | 9/13/2004 08:17 | | 20-1144 | 9/14/2004 15:13 | 9/14/2004 15:13 | | |
| 18297 | Final Elec | 1 | Disapprove | 20-1144 | | | 9/13/2005 08:47 | | 20-1144 | | 8/13/2005 | feeders and subfeed not under floor joists need protection | |
| 24263 | Final Elec | 1 | Approved | 20-1144 | 7/8/2005 09:46 | 7/7/2005 09:45 | | | 18-4973 | 7/8/2005 13:09 | 7/8/2005 13:09 | | |

#### Related CDR Applications

(Tab Not Loaded)

#### Maintenance

(Tab Not Loaded)

Sauer Docs 0271

From:                                                03/21/2011  05:43    #020 P. 004/005

ISSUED
DEPT. FILE COPY

# BUILDING
# PERMIT

VALIDATION

DATE __April 26, 2004__          PERMIT NO. __25738__

APPLICANT __Blacketer Company__     ADDRESS __225 So. Hurstbourne Pkwy., Louisville 40222__
__423-9300__ (NO)                    (STREET)                          (CONTR'S LICENSE)

PERMIT TO __construct__ (     ) STORY __single family residence__   NUMBER OF DWELLING UNITS __1__
(TYPE OF IMPROVEMENT)    (NO.)        (PROPOSED USE)

AT (LOCATION) __1800 Mayo Lane, Prospect, Ky. 40059__              ZONING DISTRICT __R-2__
(NO)                    (STREET)

BETWEEN _____ AND _____
(CROSS STREET)                          (CROSS STREET)

SUBDIVISION _____  LOT __4__ BLOCK _____ LOT __1-2C__

BUILDING IS TO BE _____ FT. WIDE BY _____ FT. LONG BY _____ FT. IN HEIGHT AND SHALL CONFORM IN CONSTRUCTION
TO TYPE __5-B__ USE GROUP __R__ BASEMENT WALLS (OR FOUNDATION _____ (TYPE)

REMARKS __Call for special inspections. Subject to current issue of the Kentucky Residential Building Code. Retaining walls over 4' in height must have an engineer's drawing and specifications.__

AREA OR VOLUME __7943 sq ft.__                 ESTIMATED COST $ __810,000__        PERMIT $ __1,032.59__
(CUBIC/SQUARE FEET)                                                    by Check #14433

OWNER __Tella Davis__
ADDRESS _____                  BUILDING DEPT.
                                                  John Stork

(Affidavit on reverse side of application to be completed by authorized agent of owner)

must be attached unless the building is located within the city limits of LaGrange or Crestwood.

K. Soil & Erosion: Best Management Practices (BMP's) must be established & maintained on this project until final stabilization is complete. (Will result in project being stopped.)

L. Property Valuation Administration will be coming by the property to inspect improvements and take pictures in January or Thereafter.

## NOTICE

SEPARATE PERMITS MAY BE REQUIRED FOR ELECTRICAL, PLUMBING, HEATING, VENTILATING OR AIR CONDITIONING. THIS PERMIT BECOMES NULL AND VOID IF WORK OR CONSTRUCTION AUTHORIZED IS NOT COMMENCED WITHIN 6 MONTHS, OR IF CONSTRUCTION OR WORK IS SUSPENDED OR ABANDONED FOR A PERIOD OF 6 MONTHS AT ANY TIME AFTER WORK IS COMMENCED.

I HEREBY CERTIFY THAT I HAVE READ AND EXAMINED THIS APPLICATION AND KNOW THE SAME TO BE TRUE AND CORRECT. ALL PROVISIONS OF LAWS AND ORDINANCES GOVERNING THIS TYPE OF WORK WILL BE COMPLIED WITH WHETHER SPECIFIED HEREIN OR NOT. THE GRANTING OF A PERMIT DOES NOT PRESUME TO GIVE AUTHORITY TO VIOLATE OR CANCEL THE PROVISIONS OF ANY OTHER STATE OR LOCAL LAW REGULATING CONSTRUCTION OR THE PERFORMANCE OF CONSTRUCTION.

The owner of this building and undersigned permit applicant do hereby covenant and agree to comply with all the applicable regulations pertaining to buildings and to construct the proposed building or structure or make the proposed change or alteration in accordance with the plans and specifications submitted herewith, and certify that the above information and statements given on this application, drawings and specifications is to the best of their knowledge true and correct. Failure of this office to note all violation in the review of plans and specifications does not relieve the contractors of the responsibility of complying with applicable codes and regulations. The Building Official reserves the right to enter the construction premises at will during reasonable working hours.

APPLICANT'S SIGNATURE _____          DATE __4/21/04__

Number of bedrooms        __3__
Number of bathrooms       __3 1/2__          Square Footage:
Construction Cost      $ __810,000.__           First Floor    __3275__
                                                Second Floor   __1580__
     Zoning          __R-2__                    Garage         __3088__
     Parcel Number   __1-2C__                   Basement       __N/A__   (If finishing)
                                                Total          __7943__

Sauer Docs 0272

From:                                    03/21/2011 05:44    #020 P.005/005

*pd 7/12/05 CR #016844*
*$25⁰⁰*                                        *25738 R.E.*



# MARY ELLEN KINSER
### OLDHAM COUNTY JUDGE-EXECUTIVE

502-222-9357   FAX 502-222-3210                    100 WEST JEFFERSON STREET
MEKINSER@OLDHAMCOUNTY.NET                          LAGRANGE, KENTUCKY 40031

# CERTIFICATE OF OCCUPANCY

### This certificate applies to the following job site:

**Building Permit Number:**     **SF0415536**
**Date Issued:**                **July 11, 2005**

Address:      1800   Mayo LN
Subdivision:                                   Lot:

PARCEL ID:1-2C; 1800 Mayo Lane; CENSUS TRACK:308.01

| 1 | Contact Type | Contact Name | Phone Number | License | License # |
|---|---|---|---|---|---|
| Primary | Contractor | Blackelor Company | 423-9300 | | |

The final inspection has been made of the above referenced project. This inspection indicates that the project was constructed in substantial compliance with the minimum requirements of the Kentucky Residential Code.

This office appeciates your cooperation and interest in building safety and permission to occupy is granted.

Sincerely,

*Gary Woods by DK*
Gary Woods
Building and Electrical Inspector

Sauer Docs 0273

# Ex. 3



# FLEXIBLE GAS PIPING
# DESIGN GUIDE
# and
# INSTALLATION INSTRUCTIONS
## March, 2003



# RESIDENTIAL • COMMERCIAL • INDUSTRIAL

FGP-001, Rev.03/03

# TABLE OF CONTENTS

Chapter 1 Introduction
    1.0 User warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
    1.1 Listing of applicable codes and standards . . . . . . . . . . . . . . . . . . . . . . .4
    TracPipe Specification Data Sheet

Chapter 2 Description of system and components
    2.0 Tubing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
        Fittings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
        Accessories . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
        Manifolds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
        Pressure regulators . . . . . . . . . . . . . . . . . . . . . . . . . .6
        Strike Protection . . . . . . . . . . . . . . . . . . . . . . . . . .6
        Shut-off valves . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    2.1 Material Use and Limitations . . . . . . . . . . . . . . . . . . . . . . . . . .7
    2.2 System Components . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
        TracPipe Flexible Gas Piping . . . . . . . . . . . . . . . . . . . . . .9
        AutoFlare Fittings . . . . . . . . . . . . . . . . . . . . . . . . . .10
        TracPipe Accessories . . . . . . . . . . . . . . . . . . . . . . . . .11

Chapter 3 System configurations and Sizing
    3.1 System configurations . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
    3.1A Series and parallel low-pressure systems . . . . . . . . . . . . . . . . . . . .13
    3.1B Dual pressure systems . . . . . . . . . . . . . . . . . . . . . . . . . .13
    3.1C System Design . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    3.1D System Pressure Choices . . . . . . . . . . . . . . . . . . . . . . . .14
    3.2 Sizing methods and examples . . . . . . . . . . . . . . . . . . . . . . . .15
    3.2A Use of sizing tables . . . . . . . . . . . . . . . . . . . . . . . . . . .15
    3.2B Sizing Examples . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
      Low-pressure systems . . . . . . . . . . . . . . . . . . . . . . . . .15
      Elevated pressure systems . . . . . . . . . . . . . . . . . . . . . .17
    3.2C Sizing Hybrid Systems  (Combination steel/TracPipe systems) . . . . .18
    3.2D Alternate Sizing Method (Sum of Pressure Loss Calculations) . . . . .20

Chapter 4 Installation Practices
    4.1 General installation practices . . . . . . . . . . . . . . . . . . . . . . . .24
        Minimum bend radius . . . . . . . . . . . . . . . . . . . . . . . . .24
        Debris protection . . . . . . . . . . . . . . . . . . . . . . . . . .24
        Support- Vertical runs/ Horizontal runs . . . . . . . . . . . . . . . .25
    4.2 Fitting Assembly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        Tubing cutting/end preparation . . . . . . . . . . . . . . . . . . . .26
        Assembly procedure . . . . . . . . . . . . . . . . . . . . . . . . .27
        Minimum tightening torque . . . . . . . . . . . . . . . . . . . . . .27
        Re-assembly procedure . . . . . . . . . . . . . . . . . . . . . . .27
    4.2A Trouble Shooting Fitting Connections . . . . . . . . . . . . . . . . . . . .28
    4.3 Routing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
        Clearance holes and notching . . . . . . . . . . . . . . . . . . . . .29
    4.3A Concealed locations for fittings . . . . . . . . . . . . . . . . . . . . . . .30
    4.3B Outdoor Installation Issues . . . . . . . . . . . . . . . . . . . . . . . .31
    4.4 Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
    4.4A Striker plate requirements . . . . . . . . . . . . . . . . . . . . . . . .32
      Spiral metal hose requirements . . . . . . . . . . . . . . . . . . . .33
      Thru-penetration Fire Stop UL Classifications . . . . . . . . . . . . . .33

4.5 Meter Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
    Termination mounts/meter mounts . . . . . . . . . . . . . . . . . . . . . . . . .34
    Direct connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
4.6 Appliance connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
4.6.1 Moveable Appliances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
    Termination fittings with appliance connectors . . . . . . . . . . . . . . . . .35
4.6.2 Fixed Appliance Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
    Direct connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
4.6A  Pad Mounted, Roof top Equipment  . . . . . . . . . . . . . . . . . . . . . .36
4.6B  Outdoor appliances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
4.6C Fireplace Installations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
4.7 Manifold Stations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
    Allowable locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
4.8 Pressure Regulators  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
    Installation requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
    Vent limiter option  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
    Vent line and siring requirements  . . . . . . . . . . . . . . . . . . . . . . . . . .40
4.8A Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
4.8B Regulator Capacity and Pressure Drop . . . . . . . . . . . . . . . . . . . . .41
4.8C Over-Pressurization protection . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
4.9 Underground Installations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
    Acceptable usage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
    TracPipePS Underground . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
4.10 Electrical Bonding/Grounding . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

Chapter 5 Inspection Repair and Replacement
5.1 Inspection, Repair and Replacement  . . . . . . . . . . . . . . . . . . . . . . . .48
    Minimum inspection requirements (check list) . . . . . . . . . . . . . . . . . .48
5.2 Repair/replacement of damaged tubing . . . . . . . . . . . . . . . . . . . . . . .49

Chapter 6 Pressure/Leakage Testing
Low-pressure systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50
Elevated pressure systems  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

Chapter 7 Capacity Tables
7 in / 0.5 in WC Drop  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53
8 in / 2 in WC Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54
11 in / 5 in WC Drop  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .55
2 PSI / 1 PSI Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56
5 PSI / 3.5 PSI Drop  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57
11 in / 0.5 in WC Drop (LP only)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57
12-14 in / 2.5 in Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58
2 PSI / 1.5 PSI Drop  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59
7.1 Table PD.1 Pressure Drop per foot for TracPipe (Natural Gas)  . . . . .60
7.2 Steel Pipe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65
7.2A Pressure Drop per 100 foot of Steel Pipe . . . . . . . . . . . . . . . . . . . .66

Chapter 8 Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .67

Appendix A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .69

## SECTION 4.10  ELECTRICAL BONDING/GROUNDING

1. The piping system is not to be used as a grounding conductor or electrode for an electrical system. In accordance with The National Fuel Gas Code NFPA 54/ANSI Z223, "each above ground portion of a gas piping system upstream from the equipment shutoff valve shall be electrically continuous and bonded to any grounding electrode, as defined by the *National Electrical Code*, ANSI/NFPA 70."

2. For bonding of the ***TracPipe*** system, a bonding clamp must be attached to the brass AutoFlare fitting adapter (adjacent to the pipe thread area -- see Figure 4-21) or to a black pipe component connected to an AutoFlare fitting. The corrugated stainless steel portion of the gas piping system SHALL NOT be used as the bonding attachment point under any circumstances. Bonding electrode conductor sizing shall be in accordance with Article 250 of ANSI/NFPA 70. The bonding is a requirement of the National Electrical Code.



Figure 4-21

BRASS BONDING CLAMPS

| TracPipe AutoFlare FITTING SIZE RANGE | BONDING CLAMP SIZE | PART NO. OR EQUAL (McMaster Carr) |
|---|---|---|
| 3/8" & 1/2" & 3/4" | 1/2" & 3/4" | 7599K71 |
| 1" | 1-1/4" | 7599K75 |
| 1-1/4" | 2" | 7599K76 |
| 1-1/2" | 2-1/2" | 7599K77 |
| 2" | 3" | 7599K78 |

# Ex. 4



# TracPipe®
*Flexible Gas Piping* by Omega Flex

# FLEXIBLE GAS PIPING
# DESIGN GUIDE
## and
# INSTALLATION INSTRUCTIONS
## July, 2004

## RESIDENTIAL • COMMERCIAL • INDUSTRIAL

FGP-001, Rev.07/04

# TABLE OF CONTENTS

Chapter 1 Introduction
   1.0   User Warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
   1.1   Listing of Applicable Codes and Standards . . . . . . . . . . . . . . . . . . . . .4
         TracPipe Specification Data Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Chapter 2 Description of System and Components
   2.0   Tubing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
         Fittings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
         Accessories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
         Manifolds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
         Pressure Regulators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
         Protection Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
         Shut-off Valves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
   2.1   Material Use and Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
   2.2   System Components . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
         TracPipe Flexible Gas Piping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
         AutoFlare Fittings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
         TracPipe Accessories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Chapter 3 System Configurations and Sizing
   3.1   System Configurations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   3.1A  Series and Parallel Low-pressure Systems . . . . . . . . . . . . . . . . . . .13
   3.1B  Dual Pressure Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   3.1C  System Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
   3.1D  System Pressure Choices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
   3.2   Sizing Methods and Examples . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
   3.2A  Use of Sizing Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
   3.2B  Sizing Examples . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
         Low-pressure Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
         Elevated Pressure Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
   3.2C  Sizing Hybrid Systems (Combination Steel/TracPipe Systems) . . . . .18
   3.2D  Alternate Sizing Method (Sum of Pressure Loss Calculations) . . . . . .20
   3.3   Gasbreaker Excess Flow Devices for CSST and
         Steel Pipe Gas Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
   3.4   Sizing Instructions for Gasbreaker Devices Used with
         CSST/TracPipe Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
   3.4A  Meter Devices (Series GB-300, GB-400, GB-600) . . . . . . . . . . . . . .25
   3.4B  Appliance Devices (Series GB-090, GB-120, GB-150) . . . . . . . . . . . .25
   3.4C  Sizing Instructions for Gasbreaker Devices with Steel Pipe Systems . . .25

Chapter 4 Installation Practices
   4.1   General Installation Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
         Minimum Bend Radius . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
         Debris Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
         Support- Vertical Runs/ Horizontal Runs . . . . . . . . . . . . . . . . . . . . . .31
   4.2   Fitting Assembly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
         Tubing Cutting/End Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
         Assembly Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
         Minimum Tightening Torque . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
         Re-assembly Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
   4.2A  Trouble Shooting Fitting Connections . . . . . . . . . . . . . . . . . . . . . . . .34
   4.3   Routing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
         Clearance Holes and Notching . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
   4.3A  Concealed Locations for Fittings . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
   4.3B  Outdoor Installation Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
   4.4   Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
   4.4A  Striker Plate Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
         Spiral Metal Hose Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
         Thru-penetration Fire Stop UL Classifications . . . . . . . . . . . . . . . . . .39

4.5     Meter Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
        Termination Mounts/Meter Mounts . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
        Direct Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
4.6     Appliance Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
4.6.1   Moveable Appliances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
        Termination Fittings with Appliance Connectors . . . . . . . . . . . . . . . .41
4.6.2   Fixed Appliance Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
        Direct Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
4.6A    Pad Mounted, Roof Top Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . .44
4.6B    Outdoor Appliances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
4.6C    Fireplace Installations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46
4.7     Manifold Stations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47
        Allowable Locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47
4.8     Pressure Regulators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
        Installation Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
        Vent Limiter Option . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
        Vent Line and Sizing Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . .48
4.8A    Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
4.8B    Regulator Capacity and Pressure Drop . . . . . . . . . . . . . . . . . . . . . . . .49
4.8C    Over-Pressurization Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50
4.9     Underground Installations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51
4.9A    Guidelines for Underground Installations . . . . . . . . . . . . . . . . . . . . . . .51
4.9B    TracPipe PS Fitting Attachment Instructions . . . . . . . . . . . . . . . . . . . .53
4.9C    Underground PS with Flexible Poly Tubing . . . . . . . . . . . . . . . . . . . . . .54
4.9D    TracPipe PS-II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56
4.9E    TracPipe PS-II Fitting Attachment Instructions . . . . . . . . . . . . . . . . . .57
4.10    Electrical Bonding/Grounding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

Chapter 5 Inspection Repair and Replacement
5.1     Minimum Inspection Requirements (Checklist) . . . . . . . . . . . . . . . . . .60
5.2     Repair/Replacement of Damaged Tubing . . . . . . . . . . . . . . . . . . . . . . .61

Chapter 6 Pressure/Leakage Testing
6.0     Pressure Test Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62
6.1     Pressure Test for Elevated Pressure Systems . . . . . . . . . . . . . . . . . . . .62
6.1A    Appliance Connection Leakage Check Procedure . . . . . . . . . . . . . . . .63
6.1B    Regulator Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63

Chapter 7 Capacity Tables
        7 in / 0.5 in WC Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65
        8 in / 2 in WC Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .66
        11 in / 5 in WC Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .67
        2 PSI / 1 PSI Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .68
        5 PSI / 3.5 PSI Drop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .69
        11 in / 0.5 in WC Drop (LP only) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .69
        12-14 in / 2.5 in Drop (LP only) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70
        2 PSI / 1.5 PSI Drop (LP only) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .71
7.1     Table PD.1 Pressure Drop per foot for TracPipe (Natural Gas) . . . . .72
7.2     Steel Pipe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77
7.2A    Pressure Drop per 100 foot of Steel Pipe . . . . . . . . . . . . . . . . . . . . . . .78

Chapter 8
        Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79

Appendix A UL Classification  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81

Appendix B Manufactured Housing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . .84

## SECTION 4.10 — ELECTRICAL BONDING/GROUNDING

1. The piping system is not to be used as a grounding conductor or electrode for an electrical system. In accordance with The National Fuel Gas Code NFPA 54/ANSI Z223, "each above ground portion of a gas piping system upstream from the equipment shutoff valve shall be electrically continuous and bonded to any grounding electrode, as defined by the *National Electrical Code*, ANSI/NFPA 70."

2. For bonding of the ***TracPipe*** system, a bonding clamp must be attached to the brass AutoFlare fitting adapter (adjacent to the pipe thread area — see Figure 4-21) or to a black pipe component connected to an AutoFlare fitting. The corrugated stainless steel portion of the gas piping system SHALL NOT be used as the bonding attachment point under any circumstances. Bonding electrode conductor sizing shall be in accordance with Article 250 of ANSI/NFPA 70. The bonding is a requirement of the National Electrical Code.



HEAVY GAUGE BONDING WIRE
BLACK IRON TEE
BONDING CLAMP
BRASS AUTOFLARE STRAIGHT FITTING

*Figure 4-21*

### BRASS BONDING CLAMPS

| *TracPipe* AutoFlare FITTING SIZE RANGE | BONDING CLAMP SIZE | PART NO. OR EQUAL (Bridge Port) |
|---|---|---|
| 3/8" & 1/2" & 3/4" | 1/2" & 3/4" | 1309-B |
| 1" | 1-1/4" | 1313-B |
| 1-1/4" | 2" | 1314-B |
| 1-1/2" | 2-1/2" | 1314-B |
| 2" | 3" | 1315-B |

# Ex. 5

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF KENTUCKY

2

3                         - - -

4

THE CINCINNATI INSURANCE     :   CIVIL ACTION
5  COMPANY a/s/o Richard Sauer :
   and Leila Davis,           :
6                  Plaintiff, :
                              :
7            vs.              :
                              :
8  OMEGA FLEX, INC.,          :   NUMBER
               Defendant.  :   3:10-cv-670-JGH
9

10                        - - -

11          Tuesday, March 13, 2012

12                        - - -

13

14          Oral deposition of STEVEN TREICHEL,
15  taken at the law offices of Marks, O'Neill,
16  O'Brien & Courtney, P.C., 1800 John F. Kennedy
17  Boulevard, Suite 1900, Philadelphia,
18  Pennsylvania  19103, beginning at 10:11 a.m.,
19  before Samuel Goldfarb, a Registered
20  Professional Reporter and an approved reporter
21  of the United States District Court.

22                        - - -

23

24      VERITEXT NATIONAL COURT REPORTING COMPANY
              MID-ATLANTIC REGION
         1801 Market Street - Suite 1800
25       Philadelphia, Pennsylvania  19103

Page 26

1                  STEVEN TREICHEL

2    decided to get into that business?

3         A.        We were purchased by a company

4    called Mestek in 1996 I believe.  Might have

5    been '95.  I think it was '96.  And the

6    chairman of Mestek wanted to enter the flexible

7    gas piping market.

8         Q.        Now, the flexible gas piping

9    market at that point, what competitors were

10   selling what we would call the equivalent to

11   TracPipe?

12        A.        The manufacturers that I know of

13   that were selling in the U.S.?

14        Q.        Yes.

15        A.        Were Gastite and Wardflex.

16        Q.        The design of TracPipe, how did

17   that occur?  How did you come up with that

18   TracPipe?

19        A.        The design of the TracPipe has

20   to be established around the requirements of

21   the ANSI LC-1 CSST standard.  There are some

22   variables that you can have in the design, but

23   it's mostly driven by the performance

24   requirements of the standard.

25        Q.        Was the ANSI LC-1 standard the

1          STEVEN TREICHEL

2     Q.          Fair, okay.

3     A.          Of course, I do believe that is

4  available on public knowledge, if I might add.

5     Q.          Who at Omega was responsible for

6  making sure the design complied with ANSI?

7     A.          Mark Albino and myself.

8     Q.          At some point, was it necessary

9  for ANSI to essentially approve the design?

10    A.          Yes.

11    Q.          Was that process done in person

12  or did you have to submit something in writing

13  to them and wait to hear back from them?

14    A.          We had to submit product to them

15  for testing.

16    Q.          The actual TracPipe?

17    A.          Yes.

18    Q.          And Omega did that?

19    A.          Yes.

20    Q.          Was it approved by ANSI?

21    A.          Yes.

22    Q.          At any point during this process

23  of developing it, was it rejected?

24    A.          No.

25    Q.          Do you recall what year ANSI

Page 29

1                STEVEN TREICHEL

2      approved the TracPipe?

3          A.          1996.

4          Q.          Once ANSI had approved it, did

5      it make you then start making the TracPipe and

6      selling it?

7          A.          Yes.  But I would like to make a

8      correction to the last question.

9          Q.          Certainly.

10          A.          You asked if ANSI approved it.

11      ANSI is not an approval agency.  They are a

12      standards writing agency.

13                The testing agency for that

14      product is conducted by or was conducted by

15      CSA, formerly known as AGA, American Gas

16      Association.  They conduct the testing and

17      certify to the standard.  And that's how you

18      get approval.

19          Q.          So CSA would have been the ones

20      that would have determined whether it was

21      compliant with ANSI?

22          A.          That's correct.

23          Q.          Did CSA determine, in 1996, that

24      the TracPipe was compliant with ANSI?

25          A.          Yes.

Page 53

STEVEN TREICHEL

1

2     A.        Okay.

3     Q.        When did Omega first manufacture

4  and sell CounterStrike?  What year was that?

5     A.        I think we introduced, to the

6  best of my recollection, the first generation

7  CounterStrike in the summer of 2004.

8     Q.        Are you able to approximate, in

9  the summer of 2004, what it would have cost to

10 manufacture TracPipe versus CounterStrike?

11    A.        I can only state that it was a

12 much bigger delta, a much higher cost than the

13 20 percent of the current product.  And that's

14 why I asked you when.

15    Q.        So, initially, when Omega first

16 started making CounterStrike, the difference in

17 increased cost was larger than the 20 percent

18 that it is now?

19    A.        That is correct.

20    Q.        Can you approximate what the

21 range was then?

22    A.        Very roughly.  Probably between

23 50 and 70 percent more expensive, but I -- that

24 is very rough.

25    Q.        Do you recall, in the 2004 time

Page 57

1                    STEVEN TREICHEL
2    ago.
3               These -- these bits of
4    information came through various people.  They
5    were not all filtered through me.
6               So I believe at some point, one
7    of the managers raised the possibility because
8    somebody told him there was a heavy lightning
9    storm the night before the leak was found, or
10   something to that effect, that, once again,
11   steered us in that direction.
12        Q.        At some point, I guess, after
13   being made aware of these claims and lightning
14   as a possible cause, did Omega begin testing
15   the TracPipe?  Essentially, did Omega perform
16   lightning tests?
17        A.        We performed lightning tests as
18   a part of the development of the first
19   CounterStrike.
20        Q.        When CounterStrike was kind of
21   in the design process, at that time was Omega
22   aware that lightning may be damaging the
23   TracPipe?
24        A.        Yes.
25        Q.        Why was CounterStrike

Page 58

```
 1                STEVEN TREICHEL
 2   essentially considered?
 3        A.      Jfor just that reason.
 4        Q.      Perfect.  Okay.
 5        A.      Well, I'll qualify that.
 6        Q.      Certainly.
 7        A.      It was for the reason of
 8   protecting against electrical arcing, but, more
 9   importantly, protecting against variations in
10   codes and installations that were putting our
11   product at risk and the public at risk.
12        Q.      Okay.
13        A.      In other words, if codes were
14   followed and bonding was enforced and it was
15   installed in accordance with our instructions,
16   there would be no need for CounterStrike.
17        Q.      Now, tell me what does Omega --
18   you're testifying on behalf of Omega -- base
19   that statement on?
20                Just so I'm clear, if I
21   understood what you just testified to,
22   essentially you indicated that if the TracPipe
23   was installed in accordance with Omega's
24   installation guide and the codes in effect,
25   that there would be no need for CounterStrike
```

Page 59

1                    STEVEN TREICHEL

2     because, if I'm understanding your testimony

3     correctly, the TracPipe would not become

4     compromised by lightning; is that correct, or

5     no?

6              A.         You're partially correct.

7              Q.         Okay.

8              A.         I believe that -- that our gas

9     piping would perform at a very high level.

10    Nothing is immune to direct lightning strikes.

11    You'll have to qualify your statement in order

12    for me to state unequivocally that there would

13    never be damage to the pipe.  It's like saying

14    lightning will never damage your computer.

15    It's just a very poor statement to make.

16              However, in the instances where

17    there was damage to our pipe as a result of

18    what we believed to be a lightning storm, it

19    had not been installed correctly or bonded

20    correctly.

21              In addition to that, we sell

22    millions of feet into Canada and Europe, who

23    potentially bond religiously.  Their codes

24    require it.  And we have never had a single

25    incident anywhere else other than the U.S.

Page 64

1                STEVEN TREICHEL

2           MR. BROOKS:  Okay.  I thought

3       you were asking the witness for an answer

4       to that.

5                MR. PAOLINI:  No.

6                MR. BROOKS:  No.  My confusion

7       is that, I guess, implicit in your

8       question is that the requirement is

9       somehow different.  You know, you're

10      making --

11                MR. PAOLINI:  I'll repeat or

12      rephrase the question.

13                MR. BROOKS:  Thank you.

14                MR. PAOLINI:  Why don't we take

15      two seconds.

16                     -  -  -

17                (Whereupon, a recess was taken

18      from 10:34 a.m. to 10:40 a.m.)

19                     -  -  -

20    BY MR. PAOLINI:

21          Q.        I think where we left off is, I

22    was going to maybe try to rephrase my last

23    question.

24                I believe earlier you testified

25    that essentially if the TracPipe was installed

Page 65

STEVEN TREICHEL

1
2    in accordance with Omega's recommendations and

3    instructions on bonding, that CounterStrike

4    essentially wouldn't have been necessary; is

5    that correct?

6            A.        That is my opinion.

7            Q.        What is the basis of that

8    opinion?

9            A.        Number one, as I stated before,

10   we had not seen any damage to TracPipe on

11   bonded systems.  When we saw the damage, it was

12   always on one bond -- unbonded systems.  So

13   that was one indication.

14                     Number two, the NFPA 780

15   lightning protection standard premises all its

16   recommendations for protection from lightning

17   of all mechanical and electrical systems on

18   bonding, taking energy to ground from all

19   points of the building, whether it be around

20   the structure or bonding the metal components

21   within the building.

22                     So based on well-known and

23   documented evidence of effectiveness of bonding

24   for lightning and the anecdotal evidence that

25   we had no perforations in buildings that were

1              STEVEN TREICHEL

2    properly bonded leads me to believe that.

3         Q.        Has Omega ever seen any case

4    where there was damage or perforation on a

5    system that was bonded?

6                   MR. BROOKS:  I think we're

7              outside the scope of Exhibit A on that

8              one.  That's, I think, going to be in

9              discussions with Tim Scanlan on -- where

10             are we -- 23 and the preceding topics.

11                  MR. PAOLINI:  I mean, he's

12             explaining an answer.  I'm not sure even

13             how to address your concerns.  He

14             answered a question.  And I just simply

15             said, well, what's the basis of the

16             answer, and he was giving it.  And you're

17             objecting.

18                  MR. BROOKS:  No.  I think the

19             question, you asked for Omega Flex's

20             awareness on a particular issue.

21                  Can I have the question read

22             back, please.

23                  MR. PAOLINI:  Right.  And he

24             testified --

25                  MR. BROOKS:  Can I have the

Page 85

STEVEN TREICHEL

1

2      A.        I am in charge of manufacturing,

3  production, materials management, purchasing,

4  inventory control, product development, and

5  play a role in overseeing our engineering

6  department.  So it's very diverse.

7      Q.        Would these departments that

8  you're kind of overseeing include the

9  manufacture and design of TracPipe?

10     A.        Yes.

11     Q.        Does Omega still manufacture and

12 design the TracPipe?

13     A.        Yes.

14     Q.        Do they sell it in the United

15 States?

16     A.        No.

17     Q.        Where is it still being sold

18 still?

19     A.        Canada, South America, U.K.,

20 South Africa.

21     Q.        Does your role also include the

22 product we've been referring to as

23 CounterStrike?  Is that within your --

24     A.        Yes, not in those places, but

25 yes.

# Ex. 6

Confidential

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF KENTUCKY
2                    CIVIL DIVISION

3

4      ------------------------------------
                                        :
5      THE CINCINNATI INSURANCE          :
       COMPANY a/s/o RICHARD             :
6      SAUER AND LEILA DAVIS             :
                                        :
7          -vs-                          :No. 3:10-cv-670-JGH
                                        :
8      OMEGA FLEX, INC.                  :
                                        :
9      ------------------------------------

10

11

12

            DEPOSITION OF: MARK ALBINO
13          DATE: March 9, 2012
            START TIME: 10:12 a.m.
14          END TIME: 1:58 p.m.
            HELD AT: Hampton Inn
15                   10 Bee Street
                     Meriden, Connecticut
16

17

18          C O N F I D E N T I A L

19

20

21

22       Veritext National Court Reporting Company
23              Mid-Atlantic Region
24          1801 Market Street - Suite 1800
25             Philadelphia, PA  19103

Confidential

Page 40

1    lightning?

2          A    No.

3          Q    During the period from 1997 to 2003, did you

4    ever receive a report of a field failure in which it was

5    alleged or suspected that TracPipe had failed as a result

6    of exposure to energy generated by lightning?

7          A    Yes.

8          Q    When did you first receive such a report?

9          A    A confirmed report was received and an

10   engineering report written in 2000.

11              THE COURT REPORTER:  I'm sorry.  A confirmed

12   report was received --

13              THE WITNESS:  A confirmed report of damage was

14   received and an engineering report subsequent to that was

15   written in 2000.  So all I could give you is the dates as

16   when the report was received.

17          Q    (By Mr. Underwood)  When you say "a confirmed

18   report was received," what do you mean when you say

19   "confirmed"?

20          A    In other words, someone confirmed that they

21   were having -- they had holes in the product.  The holes

22   were looked at, and we determined that there was some type

23   of electrical energy, and then, at that point, we went out

24   and investigated.

25          Q    Okay.  What did that determination consist of?

Confidential

1    Q    Okay.  If you could refer to the last page of

2  this document, you'll see that there is an approved by

3  section.  Your name is there?

4    A    Yes.

5    Q    And then there's a signature below that.  Is

6  that your signature?

7    A    Yes.

8    Q    Okay.  And did you review this report before

9  you signed it?

10    A    Yes.

11    Q    Okay.  Is this the report that was prepared by

12  Mr. Rivest as a result of his initial field investigation

13  in 2000?

14    A    Yes.

15    Q    And this was the investigation that you sent

16  him out to perform?

17    A    Yes.

18    Q    Section number 3, entitled background, contains

19  the following sentence.  It states:  Over the past

20  fifteen months, there have been eight reported field

21  failures which could be attributed to possible lightning

22  strikes.

23         Do you see that?

24    A    Yes.

25    Q    Do you know what's referred to there when it

Confidential

Page 49

1    says over the past fifteen months?

2         A    Yes, I do.   This is a utility in Tennessee.

3    And this utility still to this day, had the highest number

4    of incidents in any one given location in the

5    United States.   And that was the reason that we sent

6    someone out, because we didn't get fifteen samples back, we

7    got a reported fifteen failures, and we had one or two

8    samples come back.   And we immediately sent someone out to

9    that arena to figure out what was going on and what was

10   different in this one county since I sell to all the

11   counties around it, and we did find differences.

12        Q    What were those differences?

13        A    They were not bonding in accordance with our

14   D and I guide.   They were -- they went back to try and

15   correct the bonding issue and drove separate ground rods,

16   so they had dual grounding systems within the home, which

17   actually exacerbated the problem, and which is against all

18   of the national codes.   And so it was mainly an education

19   point at that point because they were not following our

20   instruction for installation.

21        Q    Did Omega Flex perform any investigation into

22   the installation practices of installers in the county

23   surrounding this -- the county where this investigation

24   detailed in Rivest number 1 took place?

25        A    Yes.   In fact, we actually spoke to their

Confidential

1    Flex back in December of 2002, that a report such as this

2    would have been referred to you?

3          A    I can't answer that question.  I don't rec -- I

4    don't remember seeing this report in this format.

5          Q    Do you have any recollection of this incident

6    described in Rivest number 2, from August 30, 2002, in

7    Loganville, Georgia being referred to you?

8          A    I do not recall this.

9          Q    Did this incident that's described in Rivest

10   number 2 result in litigation?

11         A    Not that I recall.

12         Q    Did you receive any reports aside from this

13   Rivest number 2 report -- strike that.

14              Putting aside whether you received Rivest

15   number 2, did you receive any reports relating to this

16   incident in Loganville, Georgia?

17         A    I don't recall this report at all.

18         Q    Okay.  Mr. Albino, I'm going to show you a

19   report we've marked as Rivest number 3.

20              MR. ANDERSON:  Thanks.

21         Q    (By Mr. Underwood)  And this is described as an

22   engineering project report, EPR 2003-07.

23              Have you seen this report before?

24         A    Yes, I've seen this report.

25              I didn't have to give --

Confidential

1              MR. ANDERSON:  That's all right.

2              THE WITNESS:  I've seen this report.  And this

3  is an extension.  You asked me if I was going -- I told you

4  you were going to tell me the date.  This is when the

5  second visit was out to Jefferson Cox County Utility

6  district.

7         Q    (By Mr. Underwood)  You described a utility

8  previously.  Is that the Jefferson Cox County Utility?

9         A    Yes.

10        Q    They were a supplier of propane?

11        A    They're a supplier of propane, yes.

12        Q    Now, this has a section in the lower left-hand

13 corner, where it states that it was created on

14 16 December 2003, and has a revision NC 24 December 2003.

15 Do you see that?

16        A    Yeah.

17        Q    Is that about the time you would have received

18 this report?

19        A    You're going to have to talk to Dean about this

20 because I don't remember the -- I was not present and I

21 don't remember the chain of events on these reports.  Dean

22 would be the one to give you the most accurate response.  I

23 read both of them, though.

24        Q    But you would have been the one to assign

25 Mr. Rivest to go out and do the investigation, correct?

Confidential

Page 62

1            MR. ANDERSON:  Are you talking about these

2    reports here, these --

3            MR. UNDERWOOD:  Sure.

4            THE WITNESS:  No, not at that time.  And there

5    was a reason for it.

6        Q    (By Mr. Underwood)  Why is that?

7        A    Because the code change had just gone into

8    effect.  And if you read these reports, it tells you that

9    none of the systems were bonded in accordance to our

10   D and I guide.  And if you equipotential bond a home per

11   the D and I guide at that time and per the National

12   Electrical Code, the likelihood is you will not have any

13   issues with nearby strikes, as these were the best we can

14   tell.

15       Q    When you say "the likelihood," you're referring

16   to that it would be less likely or that it would be

17   eliminated -- strike that.

18            When you say "the likelihood," are you

19   referring to the possibility that a failure in the TracPipe

20   would be eliminated by bonding or that it would just be

21   less likely?

22       A    For indirect strikes, my experience is zero for

23   Omega Flex if the system was properly installed.

24       Q    And how did you make that determination?

25       A    I keep statistics.

Confidential

1     Q     How do you keep those statistics?

2     A     These documents all go back to a file.  And

3  that file tells you what the -- you know, what the

4  incidents were and what the condition of the incidents

5  were, whether they were direct strikes or indirect strikes.

6     Q     When you use the terminology direct versus

7  indirect, what does that mean?

8     A     Whether the building was damaged directly or

9  was the build -- or was it something the tree got struck or

10  the light -- the telephone poles outside the building got

11  struck.

12     Q     Where a telephone pole or something outside the

13  building got struck, would that be considered an indirect

14  strike?

15     A     Yes.

16     Q     Has Omega Flex performed any testing to

17  determine the effect of bonding TracPipe in accordance with

18  the design and installation guide?

19     A     Have we done any testing?

20     Q     Right.

21     A     There is sound engineering documentation for

22  fifty years out there that is a proper method of handling

23  this.

24     Q     Has Omega Flex performed any testing to

25  determine the effectiveness of bonding in accordance with

Confidential

Page 68

1      Q      What sort of markings were placed on the yellow

2  jacket for TracPipe?

3      A      There's a host of markings that are within our

4  certification.

5      Q      What types of information are provided?

6      A      Just our registration numbers and those sorts

7  of issues.

8      Q      Is it date stamped --

9      A      Date coded per the LC-1 standard.

10     Q      The testing you just described, what were the

11  circumstances under which that testing was performed?  Why

12  did you do that testing?

13     A      I just told you that two questions ago.

14     Q      I understand you wanted to determine the energy

15  that it took to puncture the steel jacket.  Why you did

16  want to make that determination?

17     A      If you read the answer back, it's there.  I

18  explained exactly why we did it.

19     Q      Well, was that in conjunction with the

20  development of a new product?

21     A      No.  It was --

22            Could you read the -- my answer back to that

23  last question?

24            I gave you the exact reason.

25     Q      Well, at some point, Omega Flex began selling

Confidential

Page 71

1    I know now?

2         Q    Well, let's start with that period of time.

3         A    At that period of time, we didn't have an

4    understanding of what the energy was in a home in an

5    indirect lightning strike.  You know, direct -- direct

6    strikes, there could -- you know, there are a lot of

7    phenomenons that could happen, and we're not looking at

8    that with these products.  Even lightning rod protection

9    systems tend to fail in direct strikes.

10        Q    Do you have an understanding now of whether an

11   indirect lightning strike will generate energy in excess of

12   1. -- in excess of .12 colums inside a home?

13        A    Yes.  The general literature and research that

14   has been done, tells us it ranges between 2 and 3 colums.

15        Q    When did Omega Flex first become aware of that

16   finding?

17        A    Probably sometime after 2004.  And these are

18   all expert -- expert's opinions.

19        Q    What were the circumstances under which Omega

20   Flex came to that knowledge?

21        A    Working with Lightning Technologies and other

22   people that were familiar with the -- with the phenomenon

23   of lightning.

24        Q    As a part of the testing you just described,

25   did Omega Flex also test new designs for the jacket coating

Confidential

1     for TracPipe?

2          A     At the same date that I gave the testing we did

3     here?

4          Q     Yeah.

5          A     No.

6          Q     Was there a subsequent round of testing that

7     investigated different products on the TracPipe line that

8     incorporated a different type of jacket?

9          A     Yes.

10         Q     When did that test take place?

11         A     I can't recall exact dates.

12         Q     Who performed the test?

13         A     Lightning Technologies.

14         Q     What were the results of that testing?

15         A     We had a difference of opinion within the

16    engineering group.  One group wanted to go to higher

17    dielectric strengths, and -- which was really -- in

18    consulting with LTI, they also agreed it probably wasn't

19    the right way to go.

20         Q     Why not?

21         A     Because you end up building up higher energies

22    and causing more destruction.  Lightning is just beyond

23    what humanly we can prevent, and it will overcome any

24    dielectrics we build to resist it.  And when it does

25    breach, it will breach in a much more violent manner.

Confidential

Page 73

1        Q    Was the yellow jacket incorporated on TracPipe

2  in the period after 1997, considered by you to be a

3  dielectric type insulation --

4        A    Yes.

5        Q    -- insulative covering?

6        A    Yes.

7        Q    The suggested changes to the jacket involving

8  the dielectric strength, what were they looking to do, make

9  it thicker?

10       A    They were looking to make it thicker, make it

11  with air gaps, and that was done.

12       Q    Were those changes to the dielectric jacket

13  ever introduced into the product on the market?

14       A    No.  It was a -- just exactly what the -- we

15  had envisioned happened at the -- in the testing.

16       Q    There was a prototype that you tested at LTI?

17       A    Yes, we just tested it at LTI.

18       Q    What were the other options that were

19  considered?

20       A    At the same time, we tested a conductive

21  polymer.

22       Q    Where did you get that polymer?

23       A    I would -- that was a polymer out off Furon.

24       Q    F-U-R-O-N?

25       A    Yeah.

Confidential

1          Q      What is Furon?

2          A      They're a manufacturer of Teflons and polymers.

3    It used to be the old -- fluoro -- fluoropolymer used to be

4    the name of them.

5          Q      Did you provide some sort of specifications to

6    Furon for what you were looking for?

7          A      Yes.  The reason we went to them is they had

8    something that was readily available to do testing with.

9          Q      What did they have?

10         A      It was a urethane -- carbon filled urethane.

11         Q      What was that product being used for and before

12   you incorporated it into the prototype?

13         A      I can't answer that question.

14         Q      How did you become aware of that product?

15         A      Research in the market.  I did not do all the

16   research.

17         Q      Who did that research on your behalf?

18         A      Probably Steve Treichel and I jointly.  I'm

19   sorry.  I'm sorry.  That's a wrong answer.  It was Dean

20   Rivest and I jointly.

21         Q      Why did Omega Flex begin investigating changes

22   in the jacket for the TracPipe product?

23         A      Well, the reason we began investigating changes

24   for the jacket is that shortly after the investigation in

25   Tennessee, we became aware that there was a lobby in effect

Confidential

Page 75

1    to remove the bonding requirement from the gas piping in

2    the 1999 code.

3              Q    Which code are you referring to?

4              A    The National Electrical Code.

5              Q    Okay.

6              A    And that concerned us greatly because we felt

7    that we have an adequate solution in place, and through

8    normal code cycle, we would, you know, take about three to

9    five years, but the codes would change throughout the

10   United States, and we'd have a consistent bonding tool

11   throughout the -- throughout the nation.

12              When we learned, I would say in 2000, very

13   close to the time that these reports were written, that the

14   Electrical Code was being lobbied to remove the direct

15   bonding, you could call it -- and there's a lot of

16   descriptions, equipotential bonding, direct bonding -- from

17   the National Electrical Code, we protested to NFPA 54 to no

18   avail, and that clause was removed from the National

19   Electrical Code.

20              We felt as a company that being that bonding

21   was going to be continued to be inconsistent and it would

22   take me at least one more code cycle to try and get it back

23   in, that we needed to build a much more robust product.

24   Although the product that we're speaking about also

25   required bonding, and we gave instructions on it, this is

Confidential

1    the one we're speaking about right now.

2         Q    What product are you talking about,

3    CounterStrike?

4         A    The one that we just did the testing on, the

5    polyurethane product.

6         Q    The polyurethane product you're referring to --

7         A    The one that we just spoke about testing.

8         Q    Okay.  Is that a product that was on the

9    market?

10        A    Yes.

11        Q    And what product was that?

12        A    CounterStrike.

13        Q    Okay.

14        A    And so that is -- that is in a nutshell why we

15   started the development program, is because we seen a code

16   change coming down the road and we were not in agreement

17   with it.

18        Q    Who was lobbying for removal of the bonding

19   requirement?

20        A    Some of that is, you know, not always public,

21   but AGA, American Gas Association was involved.

22        Q    Did you have an understanding of why AGA was

23   lobbying in that regard?

24        A    You'd have to ask them.  It would be secondhand

25   on anything I gave you.

1        A     Yeah.  Conductive jacket.

2        Q     And what are the results of that testing?

3   First of all, you were present during the testing?

4        A     I was present during this testing, yes.

5        Q     And that testing took place at Lightning

6   Technologies in Pittsfield, Mass.?

7        A     Yes.

8        Q     And --

9        A     Well, the results are here.  We were able to --

10  we were able to increase -- without reading through the

11  details, I can give you the general -- we were able to

12  increase the resistance to damage due to electric -- due

13  to electric discharge from the .12 colums to about 1 colum.

14       Q     With what design?

15       A     With the conductive jacket of design.

16       Q     Was the design incorporating the conductive

17  jacket that was able to resist 1 colum introduced into the

18  market?

19       A     Yes, it was.

20       Q     Okay.  And what brand name -- model name was

21  used for that product?

22       A     That was TracPipe CounterStrike.

23       Q     Have there been different generations of the

24  TracPipe CounterStrike product?

25       A     Yes.  There is a -- the generation that is

Confidential

1   currently being sold -- this was discontinued, and there's

2   a generation that is currently being sold, which is --

3   meets the E84 flame and smoke spread requirements, and it

4   will test on a piece of half-inch up to 6 colums energy.

5        Q    So there are two generations of TracPipe

6   CounterStrike?

7        A    Yes.

8        Q    Okay.  When was the first generation of

9   TracPipe CounterStrike introduced?

10        A    2004.

11        Q    Around July 2004?

12        A    Yeah, it sounds about right.

13        Q    Okay.  And as you just described, that product

14   was able to withstand 1 colum approximately?

15        A    Yes.  It was able to withstand, and it needed

16   to be installed in the exact same manner as the yellow

17   product.

18        Q    So it would need to be installed in a manner

19   that incorporated direct bonding, as detailed in the design

20   and installation guide first introduced in October 1999?

21        A    Yes.

22        Q    Okay.  During what period of time was that

23   first generation of CounterStrike on the market?

24        A    I think until 2007.

25        Q    Is that the point at which the second

Confidential

1   generation of CounterStrike was introduced?

2        A    Yes.

3        Q    How did the second generation of CounterStrike

4   differ from the first generation?

5        A    As I stated earlier, E84, flame and smoke

6   spread, it met those standards, and it had a higher

7   resistance to transient arcing.

8        Q    I believe you testified just a few seconds ago

9   that it could withstand 6 colums?

10       A    Yes.

11       Q    I'm going to show you a report we previously

12  marked Rivest number 5.  That's entitled current conduction

13  test of Omega Flex conductive jacketed flexible gas piping.

14  It has a date of 19 September 2003.

15            Let me first ask you, have you seen that report

16  before?

17       A    I'm sure I've seen it.  I'm going to have to

18  familiarize myself with it.  I was not -- I can tell you

19  right now, I was not witness to this -- this testing.

20       Q    Okay.  If you could turn to the second page.

21       A    Yes.

22       Q    Along the right-hand side, there's a -- I'm

23  sorry.  The second page of the actual document.  Along the

24  right-hand side, there's a section that says witness and

25  by.  Do you see that?

Confidential

Page 88

1      Q      What was the thickness of the jacket that was

2    introduced in July 2004?

3             MR. ANDERSON:  If it's in there.

4             THE WITNESS:  Well, that I can answer.  40 to

5    45 thousandths.

6      Q      (By Mr. Underwood)  Of?

7      A      Of an inch.

8      Q      How did the -- putting aside, you know, the

9    standards that it adhered to and its resistivity to the

10   effects of energy and lightning, how did the first

11   generation of CounterStrike differ from the second

12   generation of CounterStrike?

13     A      In what manner?

14     Q      Well, let's start with the steel jacket.  Was

15   the steel jacket any different?

16            MR. BROOKS:  Steel jacket?

17            MR. UNDERWOOD:  Oh, I'm sorry.  I take that --

18   I --

19            THE WITNESS:  I was going to ask the same

20   question.

21     Q      (By Mr. Underwood)  Sure.  The steel tube?

22     A      The steel tube is exactly the same.

23     Q      Okay.  How was the jacket different?

24     A      It was -- the second generation?

25     Q      How did it differ -- how did the second

Confidential

Page 89

1    generation differ from the first generation?

2         A    Okay.  It's -- one was a urethane-based

3    polymer, and the second generation is a polyethylene-based

4    polymer.  One contains flame retardants to meet the E84,

5    which is the second generation.  The first generation does

6    not.

7         Q    Any other differences?

8         A    No.  Essentially, not.  Thicknesses are about

9    the same.

10        Q    When the first generation of CounterStrike was

11   introduced into the market in July 2004, did Omega Flex

12   remove TracPipe from the market at that time?

13        A    No, we did not.

14        Q    Why not?

15        A    For a host of reasons.  First of all, when we

16   introduced the black jacket into the marketplace, CSA

17   listed the product, and there was protest from our

18   competitors.

19        Q    What is CSA?

20        A    Canadian Standards Association.  That's our

21   listing agency for our licenses.

22             Protested this product because of color, and it

23   was an interpretation of the LC-1 standard that was at

24   odds.  So, you know, the first issue was a political issue.

25   And subsequent to our initial approvals, the product was --

Confidential

Page 92

1    -- you asked me a question, I'm trying to answer the first

2    question.   The first question was why did you not pull

3    TracPipe from the market, if I'm not mistaken.

4         Q    That was the initial question.

5         A    Right.   I'm trying -- this is the reason.

6    Because I did not have a steady supply stream to replace

7    TracPipe, number one.   Number two, when you design and

8    introduce a new product, it might work fine in the

9    laboratory, but I don't work off of laboratory statistics.

10   I have to do field trials.   And we were very methodical in

11   the way we went to market.

12        We went to market in the highest lightning

13   frequency areas in the United States.   We test marketed the

14   product and established -- you know, tried to establish any

15   unintended consequences.   A changed design of a product,

16   there might be some unforeseen consequences.   I put a

17   conductive jacket into the marketplace, is there something

18   I'm missing in the laboratory?   So we did trial marketing.

19        Q    Where did that --

20        A    We started in Texas.

21        Q    Okay.   During what period of time?

22        A    We introduced it in July 2004 in Texas, and we

23   pushed it into the Texas market probably for a couple years

24   after that.

25        Q    Was it sold anywhere else other than Texas?

Confidential

1        A     Yeah, it was.  We kept broadening -- our first

2    customer was actually in Pittsburgh.  You know, we could --

3    you know, we picked different areas that we knew seemed to

4    be hot spots for lightning or people were having problems

5    in those areas.

6        Q     And what were those locations?

7        A     I could -- Pittsburgh and Texas at this point.

8        Q     At what point did it expand beyond those

9    locations?

10       A     After the first year, we kind of just opened it

11   up and allowed anyone to buy it that wanted to buy it.

12       Q     So around 2005?

13       A     Yes.  But there were a couple of other issues

14   also.  The product did not have the E84 listing.  It wasn't

15   fit for use in all applications.

16       Q     What applications could it not be used for?

17       A     Plenum rating, where smoke and flame was a

18   requirement.  Couldn't go in return air plenums, couldn't

19   go in dropped ceilings.  Those types of issues.  We were

20   currently at that time, working on a second generation,

21   which was brought forward.

22       Q     Okay.  Any other reasons why TracPipe was not

23   removed from the market when TracPipe CounterStrike was

24   introduced in 2004?

25       A     The main reason is I had no market data back.

Confidential

1    I would have been irresponsible as an industry if I bring

2    something into the marketplace that ended up being a

3    problem -- a different sort of a problem.

4        Q    You indicated that the second generation of

5    CounterStrike was introduced around 2007?

6        A    Yes.

7        Q    Okay.  Did Omega Flex continue to sell the

8    first generation -- strike that.

9            Did Omega Flex continue to sell TracPipe after

10   the second generation of CounterStrike was introduced into

11   the market?

12       A    Yes.

13       Q    Why did it continue to sell TracPipe?

14       A    Same question.  I changed the polymer again.

15   I've put -- changed the design -- the design of that jacket

16   again, and I wanted to make sure it was as reliable as the

17   laboratory told me it was going to be.

18       Q    How did you make that determination?

19       A    Keeping track -- keeping records of our

20   products, our returns, were there any instances that were

21   involved in lightning, were there any failures or

22   perforations of the product, were there any -- you know,

23   normal fish bone charges, essentially what it is, you know,

24   just like you do in the automotive industry.

25       Q    During the period when the first generation of

Confidential

Page 98

1    pipe.  And yellow product in the CounterStrike I, we're

2    required to have an equipotential bond back to the

3    grounding electrode in the home.

4               MR. ANDERSON:  And to clarify, the yellow

5    product is the TracPipe.

6               THE WITNESS:  Right.

7               And -- go ahead.

8        Q    (By Mr. Underwood)  In practical terms, your

9    design and installation guide, beginning with the version

10   in October 1999, contained a diagram that literally showed

11   a clamp on a portion of the gas system, correct?

12       A    Yes.  And there's been a few illustrations

13   that, you know, changed over the years.

14       Q    But it depicted a clamp with a bonding or

15   grounding electrode coming off of it, correct?

16       A    Yes.

17       Q    Okay.  Did the second generation of

18   CounterStrike need to be bonded in the manner consistent

19   with that diagram that was included in the design

20   installation guide?

21       A    Not by us.  Local jurisdiction takes author --

22   final -- has final authority.

23       Q    But your design and installation guide did

24   not --

25       A    No.

Confidential

Page 99

1       Q     -- require it?

2       A     No.

3       Q     Okay.  Why did the second generation of

4    CounterStrike not need to have -- be bonded with a direct

5    clamp like the earlier version of CounterStrike and the

6    TracPipe product?

7       A     Because we were three times higher in strength

8    than the theoretical energy that would be found in a home

9    in a nearby lightning strike.

10      Q     Was there a period of time when the second

11   generation of CounterStrike was evaluated in the same type

12   of test marketing that was utilized in the first generation

13   of CounterStrike?

14      A     Yes.

15      Q     What was that time period?

16      A     Until September of last year, 2011.

17            MR. ANDERSON:   Yeah.

18      Q     (By Mr. Underwood)  So for four years?

19      A     Yeah.

20      Q     Did the second generation CounterStrike have a

21   limited rollout as the first generation did?

22      A     It was -- we offered it throughout the --

23   throughout the United States and Canada.

24      Q     The first testing period for -- strike that.

25            The testing period and evaluation period for

Confidential

Page 101

1    levels of --

2         A    Right.

3         Q    -- energy?

4              And the period of evaluation for the second

5    generation lasted from its rollout until September 2011?

6         A    Yeah.

7         Q    What did that evaluation consist of with regard

8    to the second generation?

9         A    Mainly field information statistics, issue --

10   any issues that would come back from the field.

11        Q    What sort of field information were you

12   evaluating?

13        A    Incidents.

14        Q    Reported incidents --

15        A    Yes.

16        Q    -- or the lack of incidents?

17        A    Yeah, lack of incidents.

18        Q    Is Omega Flex aware of any instances in which

19   the second generation of CounterStrike has been perforated

20   as a result of energy from lightning?

21        A    No.

22        Q    When the first generation of CounterStrike came

23   onto the market, was there a price difference between that

24   product and the TracPipe product that had previously been

25   on the market?

Page 102

1        A    Yes.

2        Q    What was the price difference?

3        A    Pipe only, about 9 percent.

4        Q    Other than pipe, was there some other --

5        A    No.

6        Q    -- differences?

7             Okay.  You can use the same fittings, correct?

8        A    Yes.

9        Q    Did that price differential change over time?

10       A    No.  That price differential is still the

11   today.

12       Q    Okay.  And when you say 9 percent, was the

13   CounterStrike product 9 percent more expensive than the

14   TracPipe product?

15       A    Yes.

16       Q    Was that the case all the way up until the

17   point at which TracPipe was removed from the market?

18       A    Well, first thing, I want to comment.  TracPipe

19   is not removed from the market.  I still sell TracPipe.  I

20   just don't sell it in North America.

21       Q    Where do you sell it?

22       A    I sell it in Canada and the UK.  Both countries

23   have equipotential bonding, and I've had zero incidents in

24   it in the fifteen years I've been selling.

25       Q    Do you have an understanding of the difference

Confidential

1   in frequency of thunderstorm activity in Canada as opposed

2   to the United States?

3            MR. ANDERSON:  Are we talking personally now

4   or --

5            MR. UNDERWOOD:  Well, it's Omega Flex --

6            MR. ANDERSON:  Yeah.

7            THE WITNESS:  Well, the chart -- it's a

8   different chart.  But I can tell you, if I go to Wisconsin

9   and I stand on one side of the border, it's no different

10  than the other side of the border.  I mean, you're talking

11  that whole Midwest region.  You know, you go either side of

12  those lakes, it's not any different.

13       Q    (By Mr. Underwood)  And how about between the

14  United States and the UK?

15       A    United States and the UK, the UK has some

16  severe storms, Europe, too.  They have similar lightning

17  patterns that we have.  You know, they're not the same.

18  They're not like Florida, they're more like the Midwest.

19       Q    Was that an evaluation that was performed by

20  Omega Flex?

21       A    Yeah.  Those are statistics -- are publicly

22  available.

23            MR. ANDERSON:  I think to clarify, he asked if

24  it was performed by Omega Flex.  Are you talking about

25  something outside --

Confidential

1          THE WITNESS:  No, no.  This is -- I forget the

2    name.  There's a -- you just buy it.  It's a standard

3    report.  But -- lightning frequency has no -- no play in

4    this.

5          Q    (By Mr. Underwood)  It didn't play a role in

6    the decision to continue selling TracPipe in Canada?

7          A    No.  Lightning -- lightning has -- no.  In

8    Canada it does, because they have equipotential bonding in

9    place.  Lightning in the United States isn't what the --

10   what the issue is.

11         Q    Well, you have equipotential bonding

12   requirements in your design and installation guide,

13   correct?

14         A    Yeah.

15         Q    Okay.  And that was the case for TracPipe, as

16   well, correct?

17         A    Yes.  The only state they're enforced in is in

18   Illinois.

19         Q    Do you have an understanding of why that's the

20   case?

21         A    Yes.  They have -- they require all metallic

22   sheathed products, either EMT or BX, in the state of

23   Illinois.

24         MR. UNDERWOOD:  Mark this as 1.

25

Confidential

1    (Plaintiff's Exhibit 1, Patent Document marked

2     for identification)

3

4    Q (By Mr. Underwood)  Mr. Albino, I'm going to

5 show you a document we've marked as Albino number 1.  It's

6 a patent document that was provided to us by counsel.

7    A Uh-huh.

8    Q Have you seen this document before?

9    A Yes.

10    Q What does it relate to?

11    A This is the patent of the first generation of

12 CounterStrike.

13    Q Okay.  Is this the product that was developed

14 by Mr. Rivest?

15    A Yes.

16    Q And this is the product that was first placed

17 onto the market in July 2004?

18    A Yes.

19    Q And you testified earlier that this product

20 that's detailed in Albino number 1 did -- it needed to be

21 bonded in accordance with the design and installation guide

22 instructions that applied to TracPipe, correct?

23    A Yes.

24    Q Referring to the list of U.S. patent

25 documents -- see, it starts on the left-hand side and

Confidential

1          A      You need a secondary containment for venting,

2    so if you have a leak, you can pipe it outside.  That's

3    standard throughout all the codes in the United States.

4          Q      Okay.  The next reference is 6276728,

5    August 2001, and it references Treichel.  Do you know what

6    that refers to?

7          A      Treichel?  Treichel, that's a -- that's a

8    fitting patent.  2000/8 -- 2001/8, I'm not sure.  I mean,

9    you're getting into details.  I'd have to go down the list.

10   I have 98 patents.

11         Q      Okay.

12         A      That could be a fitting patent or it could be

13   PS2, which is another underground product.

14         Q      And the next one, 6315003 for November of 2001,

15   Albino, what does that refer to?

16         A      That's a fitting.

17         Q      Continuing down, 6428052, August of 2002,

18   Albino, et al, what does that refer to?

19         A      It's a continuation of a patent.  All three of

20   them are essentially -- the one below it, too -- are

21   essentially the same fittings.  There was legal work done

22   on that with Parker Hannifin, and there was actually a

23   subsequent patent issued after the court.

24         Q      Was there some sort of litigation between

25   Parker Hannifin and Omega Flex?

Confidential

Page 108

1      A    Yeah.  If you look into those, yes.

2      Q    And then finally, the 6695353 from February of

3   2004, referencing Mr. Treichel, was that also related to

4   the fittings in the situation you just described?

5      A    It could -- I think it -- I think it's a fair

6   -- I don't remember, but it could be a fitting or it could

7   be an underground product.

8      Q    Okay.  Does Omega Flex sell the TracPipe

9   product in the United States presently?

10     A    The yellow product?

11     Q    Correct.

12     A    No, we do not.

13     Q    When did it stop selling yellow jacket TracPipe

14  in the United States?

15     A    End of September, last year.

16     Q    So September 2011?

17     A    Yeah.

18     Q    And why did it stop selling yellow jacket

19  TracPipe in the United States?

20     A    We felt that the product had proven itself as a

21  product that can withstand the marketplace in the

22  installation, in the manner that we prescribed to install.

23     Q    When you're referring to the "product," are you

24  referring to the second generation CounterStrike?

25     A    Second generation CounterStrike.  This is all

Confidential

Page 109

1    in regard to the second generation.

2         Q    Okay.

3              MR. BROOKS:  I'm sorry.  I thought the original

4    question was, the decision to discontinue TracPipe in the

5    U.S.

6              MR. UNDERWOOD:  Yes.

7              THE WITNESS:  Right.  The reason we

8    discontinued TracPipe was because we had completed our

9    evaluation on CounterStrike.

10        Q    (By Mr. Underwood)  Okay.

11        A    And we determined that due to the

12   inconsistencies of the codes across the United States, the

13   inconsistency of enforcement, that it was a much better

14   product to put out into the marketplace in North America.

15   And that was really, you know, the basis for our decision.

16   There were a lot of factors there, but that was the basic

17   reasoning.

18             We had finished our evaluation.  We determined

19   that it was a very safe product.  We have had zero

20   incidents with it.  And we feel the other product is safe

21   when installed properly, but we --

22        Q    What other product?

23        A    The TracPipe -- the original TracPipe.  We feel

24   that is a safe product also, but it has to be installed

25   properly.

# Ex. 7

Page 1

1                    - - -

2        IN THE UNITED STATES DISTRICT COURT

     FOR THE WESTERN DISTRICT OF KENTUCKY

3              CIVIL DIVISION

4                    - - -

5   THE CINCINNATI INSURANCE :

    COMPANY a/s/o RICHARD    :

6   SAUER and LEILA DAVIS    :

            Plaintiffs        :

7                             :

        vs.                   :   NO. 3:10-cv-670-JGH

8                             :

    OMEGA FLEX, INC.          :

9           Defendant         :

10                   - - -

11       Wednesday, January 11, 2012

12                   - - -

13        Oral Deposition of DEAN W. RIVEST, P.E.,

14   taken at Marks, O'Neill, O'Brien & Courtney,

15   P.C., 1800 JFK Boulevard, Suite 1900,

16   Philadelphia, Pennsylvania, commencing at 9:10

17   a.m., before Susan Marie Migatz, a Federally

18   Approved Registered Merit Reporter, Certified

19   Realtime Reporter, Certified LiveNote Reporter,

20   and Notary Public in and for the Commonwealth of

21   Pennsylvania and the State of Delaware.

22

                     - - -

23

        VERITEXT NATIONAL COURT REPORTING COMPANY

24            MID-ATLANTIC REGION

        1801 Market Street - Suite 1800

25     Philadelphia, Pennsylvania 19103

Page 18

DEAN W. RIVEST, P.E.

1
2 that.
3     Q.   Did that responsibility relate to the
4 manufacturing process?
5     A.   Yes.
6     Q.   What were your responsibilities with
7 regard to failure analysis?
8     A.   When product is returned from the
9 field, I would perform an analysis and determine
10 what the most probable cause was.
11     Q.   For what reasons were products
12 returned from the field back in 2000?
13     A.   Many, many reasons.  Product misuse,
14 handling damage, improper installation.  There's
15 just a whole slew of issues.
16     Q.   Did you receive returns from the field
17 in which it was alleged that corrugated
18 stainless steel tubing products had been
19 affected by lightning?
20     A.   When we initially started, product was
21 returned that had a hole in it.
22     Q.   Who returned the product to you?
23     A.   It could have been various people.
24     Q.   Who were the typical sources?
25     A.   A customer.

Page 19

DEAN W. RIVEST, P.E.

1
2     Q.   When was the first time you received a
3 CSST pipe from the field that had a hole in it
4 that you just described?
5     A.   I would have done an analysis in 2000.
6     Q.   What did that analysis consist of?
7     A.   I'm not sure what you're asking me.
8     Q.   You said you would have performed an
9 analysis.
10     A.   How do I do an analysis?
11     Q.   Yes.  What did you do?  When you did
12 that analysis, what did you do?
13     A.   We would look at the type of -- we're
14 specifically talking about a hole in the pipe?
15     Q.   Correct.
16     A.   Because, again, there's lots of
17 things.
18     A hole, we would look at what did the
19 hole look like, was it a puncture from the
20 inside, was it a puncture from the outside, how
21 did it originate, was the jacket melted, could
22 it have been a nail that was driven through it,
23 could someone have driven over it with a truck
24 in the field.  So we would try to identify what
25 a probable cause was, looking at the shape, the

Page 20

DEAN W. RIVEST, P.E.

1
2 probable location within the pipe of how it was
3 installed.
4     Q.   What factors or features did you come
5 to identify as consistent with the TracPipe®
6 being punctured by the energy from lightning?
7     A.   The puncture was fairly uniform in
8 size.  There was melting around the edge of the
9 hole.  And the jacket, the yellow jacket, would
10 have been burned as well.
11     Q.   How did you come to identify those
12 factors?
13     A.   By reviewing the product.
14     Q.   In what way?
15     A.   We would use a microscope.  We would
16 use just a visual analysis.  We would use
17 micrometers to measure the hole.
18     Q.   When did you first come to the
19 conclusion that a piece of TracPipe® had been
20 punctured by the energy from lightning?
21     A.   We actually went out into the field
22 and reviewed a number of installations of where
23 this occurrence had happened and looked at all
24 of the parameters governing the installation,
25 the bonding and grounding requirements, the

Page 21

DEAN W. RIVEST, P.E.

1
2 actual contractor that did it, just to
3 understand what was happening in the field.
4     Q.   Okay.  When did that investigation
5 begin?
6     A.   It began in about 2001.
7     Q.   What did that investigation consist
8 of?  You went out to the field; right?
9     A.   Yes.
10     Q.   Where did you go?
11     A.   Tennessee.
12     Q.   Why Tennessee?
13     A.   There were a high number of
14 occurrences with a hole in it that were similar,
15 so we felt that there was something with this
16 particular part of the country, these particular
17 installations, that was causing a hole to
18 happen.
19     Q.   Other than yourself, who was a part of
20 that investigation?
21     A.   Bill Rich.
22     Q.   Who was Bill Rich?
23     A.   At that point in time I believe he was
24 director of codes and standards.
25     Q.   Is Mr. Rich still with the company?

6 (Pages 18 - 21)

Page 30

DEAN W. RIVEST, P.E.

1
2   Q.  Who was that?
3   A.  I do not remember.
4   Q.  And you don't remember which utility
5 it was?
6   A.  I do not.
7   Q.  Okay.  Where in Tennessee were these
8 locations that you inspected?
9   A.  Generally Knoxville, but it could have
10 been surrounding areas.
11   Q.  Did anyone accompany you on your trip
12 to Tennessee?
13   A.  Bill Rich.
14   Q.  Was there a division of labor between
15 yourself and Mr. Rich regarding this
16 investigation?
17   A.  No.
18   Q.  Other than a person from the gas
19 utility, did you meet with anyone else in
20 Tennessee?
21   A.  Homeowners just to allow access to the
22 house.
23   Q.  Did you interview any of them?
24   A.  No, we did not.
25   Q.  What was the scope of your

Page 31

DEAN W. RIVEST, P.E.

1
2 investigation on site at the homeowners' homes?
3 What did you do?
4   A.  We reviewed where the product was
5 installed.  We reviewed the current product that
6 was there.  At this point, when we went back,
7 the system had been repaired, so we couldn't
8 exactly see a piece of pipe with a hole in it in
9 service.  So we reviewed where the product had
10 been installed, what we thought would have been
11 the installation conditions at that point when
12 it was installed, and then anything else that
13 appeared unusual or out of the ordinary.
14   Q.  Did you create any documents as a part
15 of your investigation?
16   A.  Yes, I did.
17   Q.  And what did that consist of?
18   A.  An engineering report that documented
19 everything we did.
20   Q.  Did you take any notes as you were
21 performing your investigation?
22   A.  Yes.
23   Q.  What became of those notes?
24   A.  They get filed.
25   Q.  Is there a file that you have for each

Page 32

DEAN W. RIVEST, P.E.

1
2 engineering report?
3   A.  Yes.
4   Q.  Did you take any photographs during
5 your investigation?
6   A.  Some.
7   Q.  Did Mr. Rich prepare any photographs
8 during his investigation in Tennessee?
9   A.  It would have been together.
10   Q.  How are those records kept with regard
11 to these investigations?
12   A.  They're filed at OmegaFlex.
13   Q.  Where in OmegaFlex?  OmegaFlex has
14 several locations; correct?
15   A.  Well, we have one manufacturing
16 facility.
17   Q.  And where is that located?
18   A.  In Exton, Pennsylvania.
19   Q.  Is that where you work?
20   A.  That is where I work.
21   Q.  Is that where you worked back in 2000?
22   A.  Yes.
23   Q.  Okay.  And where are the documents you
24 just described with regard to your engineering
25 reports physically kept?

Page 33

DEAN W. RIVEST, P.E.

1
2   A.  In engineering records, where we keep
3 all of our documents.
4   Q.  Was there a set form that you would
5 utilize when performing these types of field
6 investigations, like a checklist?
7   A.  Generally there's a template on how to
8 do an analysis.
9   Q.  Was that template in place when you
10 did this analysis back in 2000 or did this
11 analysis in Tennessee?
12   A.  Generally, yes.
13   Q.  Who generated the template?
14   A.  I did.
15   Q.  And you said you came on in May of
16 2000?
17   A.  Correct.
18   Q.  How soon after you came on were you
19 given this assignment to investigate these
20 failures in Tennessee?
21   A.  2001.
22   Q.  In the six sites that you located and
23 performed investigations, what was the nature of
24 the problems, if any, that the homeowners had
25 experienced as a result of the holes in their

9 (Pages 30 - 33)

DEAN W. RIVEST, P.E.

2 TracPipe®?

3    A.   I don't believe there were any actual
4 fires.  It was more of a smelled gas in the
5 house.

6    Q.   Now, with regard to the six locations
7 that you investigated, did you make a
8 determination of whether the TracPipe® in those
9 instances had suffered a failure as a result of
10 the energy from lightning?

11    A.   We did determine the most probable
12 cause was an indirect lightning strike.

13    Q.   How did you come to that
14 determination?

15    A.   Based on the analysis of the shape of
16 the hole, the melting, obviously heat was
17 generated, the location of the product with
18 respect to other components of the structure.

19    Q.   Why was that important?

20    A.   That created the potential for arcing.

21    Q.   What other items were located near the
22 TracPipe®?

23    A.   It was various items.  It could have
24 been electrical wiring.  I believe one of the
25 instances was a mobile home, so the steel

DEAN W. RIVEST, P.E.

2 girding underneath.

3    Q.   Anything else?

4    A.   That's all I can think of right now.

5    Q.   Prior to performing this investigation
6 in Tennessee, had you had any experience in
7 electrical work?

8    A.   In my course of designing equipment, I
9 designed the control system for the machinery.

10    Q.   Had you had any experience in
11 lightning studies or lightning analysis?

12    A.   No, I had not.

13    Q.   How did you come to the knowledge of
14 what a piece of metal would look like if it had
15 been affected by lightning?

16    A.   We felt that it was -- or I felt that
17 it was the melting of the material and the
18 heating up and the way that the product was
19 installed showed that it had been melted.

20    Q.   What about the way the product had
21 been installed indicated that the TracPipe® had
22 been melted?

23    A.   Because of the proximity close to a
24 piece of wire and structure.

25    Q.   In those instances in which the CSST

DEAN W. RIVEST, P.E.

2 had been installed close to the home's wiring,
3 how did you eliminate a failure in the wiring as
4 opposed to the effect of an indirect lightning
5 strike?

6         MR. BROOKS:  Can I have the
7    question read back to me, please.

8         - - -

9         (Whereupon the court reporter
10    read back the pertinent testimony.)

11         - - -

12         MR. BROOKS:  I'll object to the
13    question.  It assumes facts not in
14    evidence.

15 BY MR. UNDERWOOD:

16    Q.   You can answer.

17    A.   Because there were no other problems
18 with the electrical system.

19    Q.   Aside from whether the TracPipe® had
20 been bonded in accordance with the installation
21 instructions we just reviewed, did you perform
22 any type of investigation to determine whether
23 the TracPipe® was connected to an appliance that
24 itself was bonded or grounded to the electrical
25 system?

DEAN W. RIVEST, P.E.

2    A.   We would have documented what each
3 connection was to the gas piping.

4    Q.   Why was that important?

5    A.   We needed to understand the entire gas
6 piping system.

7    Q.   Why was that important?

8    A.   To understand if another piece of
9 appliance was bonded or grounded.

10    Q.   Why was it important to realize or
11 determine whether another piece of equipment or
12 appliance in the home was bonded and grounded?

13    A.   Because it's a continuous system so if
14 one piece is grounded, that would in effect
15 ground the remainder of the system and bond it.

16    Q.   Putting aside whether the TracPipe®
17 was bonded in accordance with the installation
18 instructions, would the connection of the
19 TracPipe® to an appliance that was itself bonded
20 and grounded provide a measure of bonding?

21    A.   It could.

22    Q.   At the time of your investigation into
23 these Tennessee incidents, did you have an
24 understanding of what the requirements were of
25 the National Electric Code for bonding of gas

10 (Pages 34 - 37)

Page 54

DEAN W. RIVEST, P.E.

1
2 within the specified time frame." How did you
3 come to that knowledge about the weather
4 conditions in Tennessee?
5     A.  There is a report that we did, we were
6 able to obtain, that actually lists the weather
7 conditions over a certain period of time in a
8 specific area, and that was something that we
9 had reviewed.
10     Q.  Did you perform any type of lightning
11 strike report at that time?
12     A.  I believe that's what it was, but I am
13 not definitively sure if it was a lightning
14 strike report or just a weather report.
15     Q.  Now, this report refers to eight
16 reported field failures; is that correct?
17     A.  That is correct.
18     Q.  Does that refresh your recollection
19 about the number of locations where there were
20 reported field failures?
21     A.  I was wrong when I said six.
22     Q.  Section 4 entitled "FIELD RESEARCH"
23 states: "Six of the eight sites were
24 investigated"; correct?
25     A.  Correct.

Page 55

1          DEAN W. RIVEST, P.E.
2     Q.  So out of the eight locations where
3 you received product with holes, you inspected
4 six; correct?
5     A.  Correct.
6     Q.  Okay.  What was the reason for not
7 inspecting the other two?
8     A.  I believe we just didn't have access
9 to them, either the homeowner wasn't available
10 or they wouldn't allow access to the site.
11     Q.  Okay.  You further state: "The
12 investigation examined the location of the
13 failure with respect to installation, location
14 of the lightning strike if known, any metal
15 chimneys or flues, and bonding of the TracPipe®
16 to the electrical grid," and then it refers to
17 Tables 1 and 2 which are on the next page;
18 correct?
19     A.  Correct.
20     Q.  Now, how did you determine the
21 location of the lightning strikes?
22     A.  In visiting the site with the
23 representative from the gas company, they would
24 have said that at this site was hit on that
25 day and the next day the homeowner smelled gas

Page 56

1          DEAN W. RIVEST, P.E.
2 in their house.  So we would have known the tree
3 got hit, not the house; or at least the tree was
4 specifically hit, maybe the house, too, but we
5 didn't definitively know that.
6     Q.  So the investigation into the location
7 of the lightning strike was based upon anecdotal
8 information provided by the utility person?
9     A.  Correct, correct, third-party
10 information.
11     Q.  You reference the location of metal
12 chimneys or flues.  Why was that important?
13     A.  That gives a potential of creating an
14 arc for creating a hole, if there's something
15 metal next to it, as I previously stated.
16     Q.  Why was that portion of the
17 investigation important with regard to your
18 analysis of whether the TracPipe® had been
19 bonded correctly or not?
20     A.  Can you say that one more time?
21     Q.  Sure.  A portion of your investigation
22 in Tennessee was devoted to determining whether
23 the TracPipe® had been bonded in accordance with
24 OmegaFlex' design and installation guide;
25 correct?

Page 57

1          DEAN W. RIVEST, P.E.
2     A.  Correct.
3     Q.  How would the presence of metal
4 chimneys or flues affect that analysis or the
5 importance of that analysis into the proper
6 bonding installation?
7     A.  Because we know metal chimneys and
8 flues are not bonded.
9     Q.  So in those cases in which a metal
10 chimney or flue may have been impacted by
11 lightning, the bonding of the TracPipe® would
12 have been immaterial?
13     A.  It's another factor to consider.
14     Q.  Why is it another factor to consider?
15     A.  Because the chimney's not bonded so it
16 does create the potential for an arc to jump and
17 create a hole.
18     Q.  Okay.  Then Section 5 are the
19 "RESULTS."  You write: "In every instance, the
20 incoming pipeline whether it was either natural
21 gas or propane, was electrically isolated from
22 the rest of the system."  What did you mean
23 there?
24     A.  In your incoming gas pipeline there's
25 an isolation fitting that basically electrically

15 (Pages 54 - 57)

Page 58

DEAN W. RIVEST, P.E.

1
2 isolates the piping going to the tank or from
3 the distribution to the piping inside the house.
4     Q.   And how does that electrically isolate
5 it?
6     A.   It's not a conductive path through.
7     Q.   Okay.  And when it says "...from the
8 rest of the system," what system are you talking
9 about?
10    A.   The gas piping system.
11    Q.   Then it says:  "This was accomplished
12 by the installation of isolation unions on
13 propane systems, or meter isolation on natural
14 gas systems."
15    A.   That's the fitting I referred to.
16    Q.   Why was that important?
17    A.   That takes the gas piping system and
18 makes it -- I don't want to reuse the word
19 "isolate," but it isolates it from the rest of
20 the system so that it's not bonded, it's just
21 sitting there by itself.
22    Q.   Are you referring to the lack of
23 bonding in accordance with the OmegaFlex
24 installation guide?
25    A.   I am.

Page 59

DEAN W. RIVEST, P.E.

1
2     Q.   Okay.  Then it states:  "Additionally,
3 none of the observed installations bonded the
4 TracPipe® to the electrical grid per the
5 recommendation as stated in the TracPipe® design
6 and installation guide dated October 1999."  Is
7 that what you were just describing?
8     A.   Yes.
9     Q.   Okay.  Did you make any determination
10 of whether the TracPipe® system at these six
11 locations was connected to appliances that were
12 bonded and grounded?
13    A.   I did state what type of appliance it
14 was connected to.
15    Q.   And is that set forth in Table 1?
16    A.   Correct.
17    Q.   Okay.  And then you have the six sites
18 in that table; correct?
19    A.   Correct.
20    Q.   Okay.  I just want to make sure I have
21 the topics or headings correct on this because
22 it's a little bit unclear from my copy.  Along
23 the left side there is a heading, I believe it
24 says "Built."
25    A.   Correct.

Page 60

DEAN W. RIVEST, P.E.

1
2     Q.   And then to the right of that for each
3 of the locations it's your information or best
4 estimate of when the TracPipe® had been
5 installed?
6     A.   Correct.
7     Q.   Okay.  And then beneath that there's a
8 heading that says "Roof Vent."
9     A.   Yes.
10    Q.   And was that the reference to chimneys
11 or flues that you described earlier?
12    A.   That is.
13    Q.   Then underneath that there's a heading
14 that says "Appliances."
15    A.   Correct.
16    Q.   And what information was included next
17 to that heading?
18    A.   That's the actual appliance that the
19 gas piping supplied.
20    Q.   Did you make a notation for those
21 appliances whether those appliances were bonded
22 and grounded?
23    A.   Yes.
24    Q.   Where is that notation?
25    A.   That's in Table 2.

Page 61

DEAN W. RIVEST, P.E.

1
2     Q.   Okay.  So in three out of the six
3 locations the TracPipe® that failed was
4 connected to an appliance that was itself not
5 bonded?
6     A.   Correct.
7     Q.   So those would have been Locations 1,
8 2, and 6?
9     A.   Correct.
10    Q.   For Locations 3, 4, and 5 the
11 TracPipe® was connected to one or more
12 appliances that were themselves bonded?
13    A.   It appears that way, yes.
14    Q.   Okay.  And in those Locations 3, 4,
15 and 5, did you determine that the TracPipe® had
16 failed as a result of the energy from a
17 lightning strike?
18    A.   That is what we believed.
19    Q.   Okay.  And that was based upon your
20 observation of the physical conditions of the
21 hole and the orientation of where the TracPipe®
22 was in the house, all the things you talked
23 about before?
24    A.   Correct.
25    Q.   Okay.  Did you make determinations of

16 (Pages 58 - 61)

Page 62

DEAN W. RIVEST, P.E.

1
2 whether the locations had suffered a direct
3 strike as opposed to an indirect strike?
4     A.  We tried to make that conclusion, yes.
5     Q.  And what did you determine?
6     A.  In the very last line of Table 1 is
7 where I tried to identify where the lightning
8 happened.  So for, say, 1, "Tree struck in
9 yard."
10     Q.  Near liquid propane tank?
11     A.  Correct.
12     Q.  Okay.  On those notations in Table 1,
13 are there any other notations indicating whether
14 it was a direct or indirect strike?
15     A.  No.
16     Q.  A tree struck near the homeowner's
17 property, would that be considered a direct
18 strike or an indirect strike?
19     A.  That would be an indirect strike.
20     Q.  As part of your analysis how did you
21 differentiate between what's a direct strike and
22 what's an indirect strike?
23     A.  A direct strike would hit the house.
24 Indirect would be something, a tree or
25 something, a telephone pole, near the house.

Page 63

DEAN W. RIVEST, P.E.

1
2     Q.  No. 6, the "ANALYSIS," states:
3 "Various failed samples that were returned from
4 the field were sectioned and examined for any
5 indication of electrical discharge."  What were
6 you looking for there?
7     A.  Melting.
8     Q.  And that was, again, a visual
9 examination?
10     A.  Yes.  When I say "sectioned," we cut
11 it in half and looked at a cross-section of it
12 under a microscope.
13     Q.  Did you preserve those samples?
14     A.  I don't believe so.
15     Q.  What became of them?
16     A.  I don't know.
17     Q.  It then states:  "All of the samples
18 exhibited a burn or melt through the wall."  Is
19 that what you just described?
20     A.  Correct.
21     Q.  And it states:  "The size of the hole
22 ranged from 1/32" to 1/16" in diameter."  It
23 then states:  "Micrographs show enlarged grains
24 at the boundary of the hole..."  What does that
25 reference?

Page 64

DEAN W. RIVEST, P.E.

1
2     A.  When a metal is heated up, the grain
3 structure changes in the metal and the grains
4 get larger.  That's just a fact of metallurgy.
5     Q.  Were you aware of that fact of
6 metallurgy before you performed this analysis?
7     A.  Yes.
8     Q.  What was the basis of that knowledge?
9     A.  I have a Master's degree in actually
10 fatigue, metal fatigue.
11     Q.  And what is your Bachelor's degree in?
12     A.  Mechanical engineering.  They're both
13 mechanical engineering.  Just my thesis was in
14 fatigue.
15     Q.  And you further stated that the
16 enlarged grains at the boundary of the hole
17 indicated "...a significant temperature increase
18 at that location," and was that a part of your
19 determination that the holes were caused by
20 lightning?
21     A.  That was the determination the holes
22 were caused by melting.
23     Q.  Okay.  How did you eliminate sources
24 other than lightning as a source of the melting?
25     A.  We couldn't find any other reason that

Page 65

DEAN W. RIVEST, P.E.

1
2 would have caused that situation.
3     Q.  Okay.  And that's what's set forth in
4 the "CONCLUSION" section, No. 7.?
5     A.  Correct.
6     Q.  All the evidence indicated that the
7 field failures were caused by a nearby lightning
8 strike and that there had been arcing between
9 the TracPipe® and a nearby metallic structure?
10     A.  Correct.
11     Q.  Okay.  And then you go on to set forth
12 the different requirements, you say, for the
13 grounding and bonding?
14     A.  Yes.
15     Q.  And what was the source of that
16 information, for that section?  Is that part of
17 your own research or did you get that from
18 someone else?
19     A.  That's my own research as to how the
20 codes flow through.
21     Q.  Okay.  Then Section 8. was your
22 "RECOMMENDATIONS" and the recommendation was
23 that a licensed electrician bond all TracPipe®
24 installations; correct?
25     A.  Correct.

17 (Pages 62 - 65)

Page 114

DEAN W. RIVEST, P.E.

1  this case. I mean, much of this --
2  THE COURT: What you can do is
3  finish the deposition you're doing now
4  and then use the rest of the day to
5  agree on what documents will be
6  produced and then in what time frame;
7  and since most of the documents, it
8  sounds like, have been produced, you
9  know, it could be another 15 days to
10  produce those documents. And then
11  also agree on all the depositions that
12  need to be taken and the purposes;
13  right?
14  MR. UNDERWOOD: Yes, Your Honor.
15  THE COURT: And then within 15
16  days those depositions will be set.
17  You can start mapping that out today.
18  You know, plaintiff's counsel can say
19  generally the dates they're available
20  in the next 60 days and then it will
21  be defendant's obligation to match
22  those up with the depositions of the
23  individuals that are going to be
24  taken. How's that sound?

Page 115

DEAN W. RIVEST, P.E.

1  MR. UNDERWOOD: That's fine with
2  the plaintiff, Your Honor.
3  MR. BROOKS: I appreciate that,
4  Your Honor. I did not ask for
5  plaintiff's availability. I was
6  dealing with these on a piecemeal
7  basis.
8  THE COURT: Well, it's a little
9  bit of a short time frame so...
10  MR. BROOKS: Right.
11  THE COURT: But, now, if we're
12  going to give everybody more time, I
13  assume that means we'll have to push
14  those other deadlines; right?
15  MR. UNDERWOOD: That's correct,
16  Your Honor.
17  MR. BROOKS: And counsel can
18  revisit those individually and submit
19  a proposed order, Your Honor?
20  THE COURT: Yes. That would be
21  fine.
22  MR. BROOKS: Okay.
23  MR. UNDERWOOD: All right. Thank
24  you, Your Honor. Thank you for your

Page 116

DEAN W. RIVEST, P.E.

1  help and sorry to disturb you.
2  THE COURT: If you all can't do
3  that today, call me back.
4  MR. UNDERWOOD: Thank you, Your
5  Honor.
6  MR. BROOKS: Thank you, Your
7  Honor.
8  THE COURT: I'll figure out
9  something really arbitrary.
10  MR. UNDERWOOD: Thank you.
11  - - -
12  (Whereupon there was a recess in
13  the proceedings.)
14  - - -
15  (Whereupon the documents were
16  marked, for identification purposes,
17  as Rivest Exhibits 2 and 3.)
18  - - -
19  BY MR. UNDERWOOD:
20  Q. Mr. Rivest, while we were off the
21  record previously, counsel provided us with
22  copies of two additional reports on OmegaFlex
23  letterhead. The first report is entitled
24  "OmegaFlex Engineering Project Report -

Page 117

DEAN W. RIVEST, P.E.

1  EPR2002-21" and we've marked it as Rivest
2  Exhibit 2. Can you identify that document for
3  me?
4  A. That is a document that I had written.
5  Q. Okay. And what does it relate to?
6  A. That is a field investigation that I
7  had done regarding a potential lightning strike.
8  Q. And where did that lightning strike
9  take place?
10  A. In Georgia.
11  Q. When you testified earlier that you
12  went on a field investigation with Mr. West, are
13  the results of that field investigation detailed
14  in Rivest Exhibit 2?
15  A. No.
16  Q. Let me show you a document entitled
17  "OmegaFlex Engineering Project Report -
18  EPR2003-07." We've marked it as Rivest Exhibit
19  3.
20  A. Thank you.
21  Q. Can you identify that document for me,
22  please?
23  A. That is the followup investigation to
24  the first one that we had talked about

30 (Pages 114 - 117)

DEAN W. RIVEST, P.E.

1
2 that was created in December 2002; correct?
3     A.   Correct.
4     Q.   Were there any other engineering
5 reports prepared by you in the interim relating
6 to lightning effects on TracPipe®?
7     A.   There's probably one more out there.
8     Q.   And what does that relate to?
9     A.   A similar type of analysis.
10     Q.   What type of incident did it involve
11 or incidents?
12     A.   The lightning.  I'm assuming that's
13 what you're asking me.
14     Q.   Correct.  Where did that incident
15 occur?
16     A.   I do not remember.
17     Q.   Who assisted you in your
18 investigation?
19     A.   David Smith would have been there.
20     Q.   When did that investigation take
21 place?
22     A.   I don't remember.
23     Q.   But it was sometime between
24 November 2000 and December 2002?
25     A.   Correct.

DEAN W. RIVEST, P.E.

1
2     Q.   What were the findings as a result of
3 that investigation?
4     A.   There was damage to the pipe due to
5 improper bonding.
6     Q.   What was the source of the heat or
7 electricity that damaged the TracPipe®?
8     A.   Lightning.
9     Q.   At any time between May 2000 and
10 December 2003 did you inspect a loss site where
11 the TracPipe® system had been bonded and
12 grounded in accordance with the TracPipe®
13 installation instructions?
14     A.   I don't believe so.
15     Q.   At any time since you started at
16 OmegaFlex have you had the opportunity to
17 inspect a loss site where TracPipe® was
18 perforated by the energy from lightning where
19 the TracPipe® system had been bonded and
20 grounded in accordance with the design and
21 installation instructions?
22     A.   I don't ever recall seeing that.
23     Q.   Is OmegaFlex aware of any instances in
24 which --
25          MR. BROOKS:  I'm just going to

DEAN W. RIVEST, P.E.

1
2     pause before I tell the witness not to
3     answer the question.
4 BY MR. UNDERWOOD:
5     Q.   Is OmegaFlex aware of any instances in
6 which a TracPipe® section was perforated by the
7 energy from lightning where the TracPipe® system
8 had been bonded and grounded in accordance with
9 the installation instructions?
10          MR. BROOKS:  You can answer that
11     question.
12          THE WITNESS:  I don't know.
13 BY MR. UNDERWOOD:
14     Q.   With regard to the investigation
15 that's detailed in Rivest Exhibit 2, what type
16 of application was the TracPipe® utilized in?
17 residential? commercial?
18     A.   Residential.
19     Q.   Did the incident involve a fire or an
20 explosion?
21     A.   Yes.  There was a fire, small fire, as
22 well.
23     Q.   How did it come about that you were
24 sent out to do this investigation?
25          MR. BROOKS:  Objection to form.

DEAN W. RIVEST, P.E.

1
2     You can answer.
3          THE WITNESS:  Can you repeat that
4     then?  I'm sorry.
5 BY MR. UNDERWOOD:
6     Q.   Sure.  You made a trip down to
7 Georgia; right?
8     A.   Correct.
9     Q.   How did you get to the point at which
10 you were in your office doing your work and then
11 you found yourself down in Georgia?
12     A.   The company was notified -- and I'm
13 not sure how we were notified; since there were
14 insurance people there, I'm assuming it came
15 through our insurance people -- to do the proper
16 investigation.
17     Q.   Did anyone at OmegaFlex contact you
18 and advise you to attend this inspection?
19     A.   Well, that would be Mark Albino; yes.
20     Q.   Did you have an understanding or do
21 you have an understanding of the criteria that
22 were necessary to have you go and do a site
23 inspection?
24     A.   What do you mean by "criteria"?
25     Q.   Sure.  Why would OmegaFlex send you

32 (Pages 122 - 125)

DEAN W. RIVEST, P.E.

1
2    Q.  But it was not bonded with a bonding
3  clamp near where the service came into the home?
4    A.  Correct.
5    Q.  With regard to the investigation
6  detailed in Rivest Exhibit 3, what was the
7  nature of that investigation?
8    A.  That was a followup to the original
9  investigation which was detailed in Rivest
10  Exhibit 1.
11    Q.  How did that investigation come about,
12  the one that's detailed in Rivest Exhibit 3?
13    A.  There were ten sites that were
14  potential incidents that we wanted to go back
15  and review with our consultant at this time,
16  John West, to review all of the installation,
17  anything that we could determine that --
18  environmental considerations, you know, the
19  weather obviously, and proper guidelines
20  concerning the implementation of the NEC.
21    Q.  Are the dates of the suspected
22  failures detailed for each of those ten sites in
23  Rivest Exhibit 3?
24    A.  I don't believe so.
25    Q.  Would the dates of these suspected

1         DEAN W. RIVEST, P.E.
2  failures be referenced in your notes?
3    A.  No.  Just so I'm clear and actually
4  you're clear on what my notes are, my notes are
5  used to generate the report, so whatever is in
6  the report is in my notes.
7    Q.  Okay.  How did you become aware of
8  these ten sites?
9    A.  Through customer returns.
10    Q.  And who provided the customer returns?
11    A.  Jefferson County Gas Utility.
12    Q.  Was that the same utility that had
13  made the request for your involvement or
14  investigation back in 2000?
15    A.  Correct.
16    Q.  For each of those ten instances did
17  you determine that lightning or the energy from
18  lightning had perforated the stainless steel
19  jacket of the TracPipe®?
20    A.  That was the most possible cause; yes.
21    Q.  Did you make a determination of
22  whether the TracPipe® was damaged as a result of
23  a direct strike or an indirect strike?
24    A.  Yes.  We tried to make that
25  determination if we could by interviewing the

1         DEAN W. RIVEST, P.E.
2  homeowners or the people in the area.
3    Q.  Were the findings from that
4  investigation detailed in your report,
5  specifically whether the strike was an indirect
6  strike or a direct strike?
7    A.  In the first line it says: "None of
8  the structures inspected indicated a direct
9  lightning strike," of No. 5. of Rivest Exhibit
10  3.
11    Q.  And that's in the
12  "CONCLUSION/RECOMMENDATIONS" section?
13    A.  That is correct.
14    Q.  In Section 4. of Rivest Exhibit 3
15  there's a "FIELD INVESTIGATION/SITE REVIEW"
16  notation and it says that "the gas piping system
17  was not properly bonded to the electrical
18  service entrance ground as required by code."
19  Do you see that?
20    A.  I do.
21    Q.  Who made that determination?
22    A.  That would have been done by myself
23  and John West.
24    Q.  Okay.  And in the third paragraph it
25  states:  "A majority of the sites reviewed were

1         DEAN W. RIVEST, P.E.
2  completed prior to January 2003..."  When you
3  say "sites...were completed," does that mean
4  that the TracPipe® was installed prior to
5  January 2003?
6    A.  That's what it means, yes.
7    Q.  Okay.  And it states that they should
8  have been installed in accordance with the 1999
9  National Electric Code?
10    A.  Correct.
11    Q.  And then you included a quote from the
12  National Electric Code there?
13    A.  Yes.
14    Q.  And you then go on to say: "None of
15  the systems reviewed were in compliance with the
16  1999 NEC."  How were they not in compliance with
17  the 1999 NEC?
18    A.  They were not electrically bonded.
19    Q.  So in those circumstances in which the
20  TracPipe® was connected to an appliance that was
21  bonded and grounded, you concluded that the
22  bonding in those cases was not in accordance
23  with the 1999 NEC?
24    A.  Correct.
25    Q.  Why not?  Why were they not in

34 (Pages 130 - 133)

Page 138

DEAN W. RIVEST, P.E.
1     DEAN W. RIVEST, P.E.
2 the possibility that TracPipe® will be
3 perforated by the energy from an indirect
4 lightning strike?
5     MR. BROOKS: Do you understand
6     the question?
7     THE WITNESS: Yes.
8     Are you asking me what have we
9     done for evaluation?
10 BY MR. UNDERWOOD:
11    Q.  Well, assume for the sake of argument
12 you have a system that is not bonded in
13 accordance with the TracPipe® installation
14 instructions and you have a TracPipe® system
15 that is bonded in accordance with the
16 installation instructions.  How much is the risk
17 minimized by bonding as opposed to not bonding
18 in accordance with the installation
19 instructions?
20    A.  I don't know that answer.
21    Q.  Does OmegaFlex have any idea the
22 extent to which the risk is minimized by bonding
23 in accordance with its installation
24 instructions?
25    A.  I don't know.

Page 139

1     DEAN W. RIVEST, P.E.
2     MR. UNDERWOOD: Can we take five
3 minutes?
4     Actually, we're close to
5 lunchtime.  I don't know how you guys
6 want to proceed on that.
7     MR. BROOKS: I don't have any
8 idea how much longer you think you
9 have.  I'll be glad to work through
10 lunch if the court reporter is okay
11 depending on how much you think you
12 have.
13    MR. UNDERWOOD: I'll be another
14 hour or two.
15    MR. BROOKS: We might as well
16 take lunch.
17    THE WITNESS: I'm good to go.
18 Whatever you want to do.
19    MR. UNDERWOOD: Why don't we take
20 a half hour and then get back to it?
21    MR. BROOKS: Okay.
22          - - -
23    (Whereupon there was a luncheon
24 recess in the proceedings.)
25          - - -

Page 140

1     DEAN W. RIVEST, P.E.
2 BY MR. UNDERWOOD:
3     Q.  Mr. Rivest, before we took a break,
4 you testified that OmegaFlex determined that by
5 bonding and grounding in accordance with the
6 installation instructions, it would minimize the
7 effects of a direct lightning strike upon the
8 TracPipe®; correct?
9     A.  Correct.
10    Q.  What's the basis of that
11 determination?
12    A.  That's what's recommended in the
13 National Electric Code and I'm following that
14 recommendation.  So by doing that it minimizes
15 damage to any system inhouse.
16    Q.  But my question is directed to
17 OmegaFlex and its determination that by bonding
18 in accordance with that Code and in accordance
19 with its installation instructions, that it will
20 minimize the effect of a lightning strike upon
21 the TracPipe®.  What's the basis of that
22 determination?
23    A.  Just by following the guidelines from
24 the NEC, that they made the recommendations and
25 we're following that as well.  So since they've

Page 141

1     DEAN W. RIVEST, P.E.
2 made that determination, we're following suit
3 with that.
4     Q.  Okay.  Did OmegaFlex ever perform any
5 testing to determine the extent or degree to
6 which bonding in accordance with the design
7 guide and installation instructions would
8 minimize the effect of an indirect lightning
9 strike on TracPipe®?
10    MR. BROOKS: You mean OmegaFlex
11 itself or its agents or --
12    MR. UNDERWOOD: Well, either
13 OmegaFlex or people acting on its
14 behalf.
15    THE WITNESS: I don't know.
16 BY MR. UNDERWOOD:
17    Q.  With regard to the reports that we've
18 marked as Rivest Exhibit 1 and Rivest Exhibit 2,
19 other than these reports, were there any other
20 type of communications between yourself and
21 Mr. Albino in writing detailing your findings?
22    A.  No.
23    Q.  Were there any e-mails that were
24 exchanged between the two of you saying, "I'm
25 back from Tennessee, this is what I found"?

36 (Pages 138 - 141)

Page 142

DEAN W. RIVEST, P.E.

1
2    A.  No, nothing specific about the site
3  other than that I'm back and I'll have a report
4  to you.
5    Q.  Okay.  Were there any e-mails or
6  communications between yourself and anyone else
7  at OmegaFlex regarding the field visit that's
8  reflected in Rivest Exhibit 1?
9    A.  I don't remember sending anything.
10   Q.  How about with regard to the field
11 report or field visits that are detailed in
12 Rivest Exhibit 2; were there any communications
13 in writing, either by e-mail or by written memo,
14 to anyone else other than Mr. Albino as
15 reflected in Rivest Exhibit 2?
16   A.  Nothing that I can remember.
17   Q.  With regard to Rivest Exhibit 3, the
18 same question, are there any communications
19 other than that report that were exchanged among
20 yourself and anyone else at OmegaFlex detailing
21 the results of your field visit?
22   A.  Nothing that I can remember.
23   Q.  You testified earlier that when you
24 did your review in 2000, you went back through
25 the computer system and identified instances in

Page 143

DEAN W. RIVEST, P.E.

1
2  which product had been returned to OmegaFlex
3  which TracPipe® had a hole in it; correct?
4    A.  Correct.
5    Q.  Is there in place some system now
6  which identifies product returned to OmegaFlex
7  in which the product has been punctured as a
8  result of lightning?
9    A.  There's a system in place that
10 identifies all product returned.
11   Q.  Okay.  Is one of the categories for
12 the product returns the impact or the effect of
13 lightning on the product?
14   A.  It would be documented in there, in
15 the return, as to what the customer suspects
16 happened; and then there would also be briefly
17 what our result is.
18   Q.  Does OmegaFlex review all products
19 that are returned from the field?
20   A.  Yes.
21   Q.  Are you the person who is ultimately
22 responsible for performing that evaluation?
23   A.  I am not.
24   Q.  Who is that person presently?
25   A.  At present I believe it's Steve

Page 144

DEAN W. RIVEST, P.E.

1
2  Treichel.
3    Q.  Did you have that responsibility at
4  one time?
5    A.  Some of the responsibility; yes.
6    Q.  And during what period of time did you
7  have the responsibility or at least some of the
8  responsibility for reviewing these products that
9  were being returned from the field?
10   A.  Up to about 2005.
11   Q.  Why did your responsibilities change
12 at that time?
13   A.  I changed jobs within the company.
14   Q.  What did you change your job to?
15   A.  I became the vice president for the
16 industrial division, which is a whole different
17 set of products.
18   Q.  Does the industrial division work with
19 TracPipe®?
20   A.  No.
21   Q.  Does it work with any CSST products?
22   A.  No.
23   Q.  When in 2005 did you transition?
24   A.  I believe it was June or July.
25   Q.  Did OmegaFlex ever perform any testing

Page 145

DEAN W. RIVEST, P.E.

1
2  in a laboratory setting to determine the effect
3  of electricity or the energy from lightning upon
4  TracPipe®?
5    A.  Yellow TracPipe®?
6    Q.  Yes.
7    A.  Only in the context of developing
8  CounterStrike®, as far as I'm aware.
9    Q.  What type of testing was performed?
10   A.  The amount of energy and the profile
11 of what that energy looks like to create a
12 breach in the pipe.
13   Q.  And what were the results of that
14 testing with regard to TracPipe®?
15   A.  It's a pretty lengthy report that was
16 written.
17   Q.  Okay.  Was there a determination made
18 of the amount of energy in coulombs that it
19 would take to puncture the steel jacket on
20 TracPipe®?
21   A.  Yes.
22   Q.  What were the results of that testing?
23   A.  Off the top of my head, I don't know.
24   Q.  Okay.
25                - - -

37 (Pages 142 - 145)

Page 150

DEAN W. RIVEST, P.E.

1   MR. BROOKS: Well, he can testify
2   to this document. To the extent that
3   he has witnessed this testing, he has
4   been a witness. Other than that,
5   we'll have to consider whether the
6   questions are going to be asked in his
7   capacity as a corporate designee --
8       MR. UNDERWOOD: Well --
9       MR. BROOKS: -- or not.
10      MR. UNDERWOOD: -- let's ask the
11   questions and we'll figure out where
12   you guys are going to go with this.
13      MR. BROOKS: Okay.
14  BY MR. UNDERWOOD:
15      Q. In the testing that's reflected in
16  Rivest Exhibit 4, what products were tested?
17      A. We evaluated a couple of different
18  iterations of the CounterStrike® product.
19      Q. Were those development? They were in
20  development?
21      A. Yes, they were developmental
22  prototypes. We evaluated different versions of
23  the TracPipe® product. And we did a comparative
24  analysis against competitive product.

Page 151

DEAN W. RIVEST, P.E.

1       Q. As a result of that testing did
2   OmegaFlex determine what level of energy was
3   required to perforate the steel jacket of yellow
4   TracPipe®?
5       A. The test results yielded that, yes.
6       Q. And what was that finding?
7          Well, if you look at the third page,
8   the bottom.
9       A. Yes. Just off the top of my head, I
10  mean, I'd have to look at the report to give you
11  specific numbers.
12      Q. Well, on the third page, the last
13  paragraph: "The TracPipe and Gastite standard
14  nonconductive jacket material could sustain a
15  maximum 0.12 coulomb discharge without a
16  puncture of the stainless steel tubing." Do you
17  see that?
18      A. I'm sorry; which page?
19      Q. It's MOOC 00482 at the bottom.
20      A. Oh, 82; I'm sorry.
21         I do see that, yes.
22      Q. Is that consistent with what was found
23  when you were there? You witnessed this
24  testing?

Page 152

DEAN W. RIVEST, P.E.

1       A. I was here, yes. I guess that's why
2   I'm confused. Yes, I was here for this testing.
3       Q. And is that consistent with the
4   findings that were arrived at while you were
5   there during the testing?
6       A. Yes.
7       Q. Okay. And when it says the
8   "...nonconductive jacket material could sustain
9   a maximum 0.12 coulomb discharge...," what was
10  that referring to?
11      A. Can you point me to where you're
12  reading that?
13      Q. Sure. That sentence says. "The
14  TracPipe and Gastite standard nonconductive
15  jacket material could sustain a maximum 0.12
16  coulomb discharge without a puncture of the
17  stainless steel tubing." What was that
18  referring to when it says "nonconductive jacket
19  material"?
20      A. That's the standard yellow product.
21      Q. And these prototypes that were being
22  developed for CounterStrike® had some conductive
23  properties that made it different than
24  yellow-jacketed TracPipe®?

Page 153

DEAN W. RIVEST, P.E.

1       A. Correct.
2       Q. And Mr. Albino was at this test as
3   well? I think the first page says "Witnessed
4   by: M. Albino."
5       A. Then, yes, I guess he was there.
6       Q. How did you come into contact with
7   Lightning Technologies for this testing?
8       A. I found them through research for
9   testing laboratories that can evaluate
10  lightning.
11      Q. And why did you start that search?
12  Why did you reach out for a company that could
13  do this type of testing?
14      A. We were developing CounterStrike®.
15      Q. Who was developing CounterStrike®?
16      A. I was. And we needed to have some
17  standardized test that we could use to evaluate
18  the product.
19      Q. And that testing determined that the
20  baseline TracPipe® system could withstand 0.12
21  coulombs of energy?
22      A. 0.12, correct.
23      Q. And what were the findings with regard
24  to the CounterStrike® products in development?

Page 162

DEAN W. RIVEST, P.E.

1
2  Q.  Is that still the case?
3  A.  No.
4  Q.  You're in a different department?
5  A.  Yes.
6  Q.  But you worked together with
7  Mr. Treichel between 2000 and 2005?
8  A.  Correct.
9  Q.  Okay.  How about Mr. Rich; was he in
10 the same department as you?
11 A.  No.
12 Q.  How was the report that is marked as
13 Rivest Exhibit 1 communicated to him?
14 A.  I potentially could have e-mailed or
15 would have sent a hard copy to him.
16 Q.  The same question with regard to
17 Rivest Exhibit 2 and Exhibit 3, was that
18 e-mailed to Mr. Albino?
19 A.  Yes.
20 Q.  Was it probably e-mailed to Mr. Rich?
21 A.  Probably.
22 Q.  And Mr. Treichel could have been
23 e-mailed or you could have handed it to him?
24 A.  Correct.
25 Q.  Did you consult with any other people

Page 163

DEAN W. RIVEST, P.E.

1
2  at OmegaFlex in conjunction with the preparation
3  of the reports we've marked as Rivest Exhibits
4  1, 2, and 3 other than Mr. Rich?
5  A.  No.
6        MR. UNDERWOOD:  At this point I'm
7        going to just move forward with
8        Mr. Rivest's fact deposition.  The
9        questions from here on out will not be
10       related to his deposition in response
11       to the 30(b)(6) Notice we have served.
12       I just want to make sure that that's
13       clear on the record.
14            With that...
15 BY MR. UNDERWOOD:
16 Q.  Mr. Rivest, did you play a role in
17 developing the CounterStrike® product?
18 A.  Yes.
19 Q.  Okay.  And you hold the patent for
20 that product; right?
21 A.  That is correct.
22 Q.  When did the development of the
23 CounterStrike® product first begin?
24 A.  There was no official kickoff or
25 anything, as you would say.  It began in a time

Page 164

DEAN W. RIVEST, P.E.

1
2  frame of about 2002 or so.
3  Q.  Was it before or after the
4  investigation you conducted down in Georgia, as
5  reflected in Rivest Exhibit 2?
6  A.  It would have been before
7  December 2002.
8  Q.  How do you know that?
9  A.  Because we did the first testing in
10 March of 2003.  It would have taken time to
11 develop that.
12 Q.  Were you responsible for the
13 development of CounterStrike® within OmegaFlex?
14 A.  Yes, I was.
15 Q.  How did you receive that assignment?
16 A.  From Mr. Albino.
17 Q.  What did Mr. Albino say to you when he
18 made that assignment to you?
19 A.  It would have been through
20 conversation of obviously we knew we had some
21 sort of issue going on with the product.
22 Q.  And what sort of issue are you
23 referring to?
24 A.  Susceptibility due to nearby lightning
25 strikes.  And we talked about things that we

Page 165

DEAN W. RIVEST, P.E.

1
2  could do to enhance the product because the lack
3  of consistency between the codes, we felt that
4  the codes weren't consistent enough, they
5  weren't applied enough in a consistent way
6  across the country, so we looked at it as a
7  product enhancement.
8  Q.  What codes are you referring to?
9  A.  I'm referring to the actual gas codes,
10 the requirements that an inspector in the field
11 would look at to determine whether the gas
12 piping is installed properly or per the code or
13 whether they follow our design and installation
14 guide or not.
15 Q.  What specifically with regard to the
16 codes did you find was not being enforced
17 uniformly?
18 A.  The bonding and grounding
19 requirements.
20 Q.  What was the basis of that
21 determination?  How did you come to that
22 conclusion?  Was it from these field visits?
23 A.  Through the field visits.
24 Q.  Okay.  So a decision was made to look
25 for a product that would better withstand the

42 (Pages 162 - 165)

Page 166

DEAN W. RIVEST, P.E.

1  energy from indirect lightning strikes?
2      A.  Correct.
3      Q.  After you received that assignment,
4  what did you do?
5      A.  How did we develop the product; is
6  that what you're asking?
7      Q.  Correct.
8      A.  We looked at two options.  One was to
9  make a conductive product.  One was to make a
10  product that was actually more insulative.
11      Q.  When you say a more conductive
12  product, what are you referring to?
13      A.  To add a jacket on the outside that
14  provides a conductive path.
15      Q.  And what was an insulated product or
16  the type of product that you were looking into?
17      A.  It does not conduct electricity.
18      Q.  Were there any other products on the
19  market in 2002 that included a conductive
20  property in it?
21      A.  Not any CSST products.
22      Q.  Were there any gas distribution
23  products that were nonconductive on the market
24  at that time?

Page 167

DEAN W. RIVEST, P.E.

1      A.  All of the competitive products were
2  nonconductive.  Is that what you're asking me?
3      Q.  Yes.  I'm asking, you said you were
4  looking at two possibilities --
5      A.  Yes.
6      Q.  -- for an improvement on the existing
7  TracPipe® design; correct?
8      A.  Correct.
9      Q.  One with a conductive jacket or
10  conductive properties.
11      A.  Uh-huh.
12      Q.  Is that correct?
13      A.  We were looking to enhance our product
14  by making a conductive jacket; not by looking
15  for a jacket we could put on it.  It's a nuance,
16  but it is a difference.
17      Q.  Sure.  You were looking to develop a
18  conductive jacket for the CSST that you were
19  producing; correct?
20      A.  Correct.
21      Q.  The other possibility that you were
22  investigating was an insulative product that
23  just did not conduct electricity whatsoever?
24      A.  Making a product, yes, that was more

Page 168

DEAN W. RIVEST, P.E.

1  insulative.
2      Q.  What sort of form of product would
3  that be?
4      A.  The yellow jacket is an insulative
5  jacket, doesn't conduct electricity.  You could
6  make it thicker, change the polymer properties.
7      Q.  What did you conclude with regard to
8  the type of design that should be pursued for
9  the enhancement to the TracPipe® product?
10      A.  We obviously decided to go with a
11  conductive jacket.
12      Q.  And why did you make that
13  determination?
14      A.  The insulative jacket, in a nearby
15  lightning strike, would transfer the energy down
16  across the jacket and it would still be in the
17  piping system somewhere along the length and you
18  would potentially be damaging other products
19  within the system, potentially our product as
20  well, but it could just be transferring the
21  energy as opposed to not necessarily trying to
22  dissipate it through the bonding requirements.
23      Q.  And how did you reach that conclusion?
24      A.  That actually was partially done in

Page 169

DEAN W. RIVEST, P.E.

1  the testing in one of these reports.  Let me
2  find the right one.
3      Rivest Exhibit 4.
4      Q.  Did the testing that's reflected in
5  Rivest Exhibit 4 also provide information
6  regarding the usefulness of a CSST product with
7  a conductive jacket?
8      A.  Yes.
9      Q.  And what did that testing determine?
10      A.  That determined that the conductive
11  jacket allowed the product to withstand higher
12  energy levels before a breach.
13      Q.  What energy levels could the
14  conductive jacket product withstand before
15  breach?
16      A.  I have to look.
17      Q.  All right.
18      A.  I don't know off the top of my head.
19      MR. BROOKS:  Can we have the
20  question read back, please.
21      - - -
22      (Whereupon the court reporter
23  read back the pertinent testimony.)
24      - - -

Page 170

DEAN W. RIVEST, P.E.

1
2     MR. BROOKS:  Thank you.
3     THE WITNESS:  During the first
4     round of testing we evaluated
5     different jackets so I can't give you
6     a specific number because it was,
7     again, iterations of different
8     designs.
9  BY MR. UNDERWOOD:
10     Q.  How many different designs did you
11  have at that time?
12     A.  We evaluated three conductive
13  products.
14     Q.  And what were the ranges of the energy
15  that those three products could withstand?
16     A.  The lowest being 0.46 coulombs, the
17  highest being 0.99 coulombs.
18     Q.  Okay.  Was one of the conductive
19  products tested in the testing reflected in
20  Rivest Exhibit 4 selected for development
21  thereafter?
22     A.  Yes.
23     Q.  Which one?  Was it the one that
24  withstood the 0.99?
25     A.  Yes.

Page 171

DEAN W. RIVEST, P.E.

1
2     Q.  And that was subjected to additional
3  testing that's reflected in Rivest Exhibit 5?
4     A.  Correct.
5     Q.  When was CounterStrike® first put on
6  the market?
7     A.  It was released in 2004, I believe it
8  was June or July.
9     Q.  At that time did OmegaFlex continue to
10  sell TracPipe®?
11     A.  Yellow TracPipe®; yes.
12     Q.  Yes.  Did you have any discussions
13  with Mr. Albino regarding whether OmegaFlex
14  should continue to sell yellow-jacketed
15  TracPipe®?
16     A.  No.
17     Q.  From 2000 to 2005, when you occupied
18  that position at OmegaFlex, you didn't have any
19  discussions with Mr. Albino about whether
20  TracPipe® should be taken off the market?
21     A.  No.
22     Q.  Did you have any discussions with
23  anyone else at OmegaFlex regarding whether
24  OmegaFlex should continue to sell TracPipe®
25  during that period of time?

Page 172

DEAN W. RIVEST, P.E.

1
2     A.  No.
3     Q.  Have you ever had any discussions with
4  Mr. Albino or anyone else at OmegaFlex regarding
5  whether TracPipe® should continue to be sold?
6     MR. BROOKS:  These are
7     discussions that don't involve
8     counsel?
9     MR. UNDERWOOD:  Yes, outside of
10     the presence of counsel.  Who would be
11     the attorney, I guess would be the
12     question.
13     THE WITNESS:  Our corporate
14     attorney.
15     MR. BROOKS:  Mr. Scanlan.
16     MR. UNDERWOOD:  Mr. Scanlan, yes,
17     I guess if that's the counsel that
18     you're referring to.
19     MR. BROOKS:  He was general
20     counsel.
21     MR. UNDERWOOD:  For OmegaFlex?
22     MR. BROOKS:  Yes.
23  BY MR. UNDERWOOD:
24     Q.  Well, did you have any discussions
25  with anyone outside of the presence of

Page 173

DEAN W. RIVEST, P.E.

1
2  Mr. Scanlan regarding whether TracPipe® should
3  be removed from the marketplace?
4     A.  No.
5     Q.  Did you have any discussions regarding
6  whether TracPipe® should be removed from the
7  marketplace at which Mr. Scanlan was present?
8     A.  In what time frame?
9     Q.  At any time frame.
10     A.  Yes.  We did remove it from the
11  market, so yes.
12     Q.  Were you a part of those discussions
13  about whether TracPipe® should be removed from
14  the market?
15     MR. BROOKS:  Are these
16     discussions with Mr. Scanlan again?
17     That was the question two questions
18     ago.  It seems like you're going back
19     and forth.
20     MR. UNDERWOOD:  Well, I'm asking
21     for whether he had discussions at
22     which Mr. Scanlan was present.
23     MR. BROOKS:  Okay.  And this is
24     before or after the decision?
25     MR. UNDERWOOD:  Well, I'm asking

44 (Pages 170 - 173)

# Ex. 8

# ΩmegaFlex

Manufacturer of Flexible Metal Hose Products



ENGINEERING PROJECT REPORT - EPR 2000-10

*An Investigation of Field Failures*
*Attributed to Possible Lightning Strikes*

## 1. OBJECTIVE

Determine possible causes for field failures initiated by possible lightning strikes.

## 2. SCOPE

Utilize field research as well as metallurgical analysis to determine the most likely cause of alleged lightning strike failures.

## 3. BACKGROUND

Over the past 15 months, there have been eight reported field failures, which could be attributed to possible lightning strikes. All of the incidents took place within the state of Tennessee, near Knoxville. Incidentally, this part of the country has had an unusually high occurrence of lightning storms within the specified time frame.

## 4. FIELD RESEARCH

Six of the eight sites were investigated. The investigation examined the location of the failure with respect to installation, location of the lightning strike if known, any metal chimneys or flues, and bonding of the Tracpipe® to the electrical grid. (See Tables 1 & 2)

## 5. RESULTS

In every instance, the incoming pipeline whether it was either natural gas or propane, was electrically isolated from the rest of the system. This was accomplished by the installation of isolation unions on propane systems, or meter isolation on natural gas systems. Additionally, none of the observed installations bonded the Tracpipe® to the electrical grid per the recommendation as stated in the Tracpipe® design and installation guide dated October, 1999. Tables 1 and 2 summarize the results of the examination of the six sites visited.

27-Nov-00 - Original Release    Page 1 of 4    OmegaFlex, Inc Confidential

**TracPipe**
OMEGAFLEX, INC., 451 Creamery Way, Exton, PA 19341-2509
Voice: 800-355-1039 or 610-524-7272 Fax: 610-524-7282 URL: www.omegaflex.com

CONFIDENTIAL ATTORNEY EYES ONLY

Confidential:
Attorney's Eyes Only

OMG 00001

MOOC 00318

EXHIBIT
Rucest 1
1/11/12    5—

# ΩmegaFlex

A New Culture of Flexible Metal Hose Products



**ENGINEERING PROJECT REPORT – EPR 2000-10**

*An Investigation of Field Failures*

*Attributed to Possible Lightning Strikes*

| Built | 1 | 2 | 3 | Site No. 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Roof/Vent | Retrofit 2 years | Retrofit 1st year | New const 1st of '97 | Existing - Ukwn | Existing - Ukwn | Existing - Ukwn |
| Appliances | None | None | None | Chimney/Mtd | Chimney/Mtd | None |
| | 1 mini-hearth no-vent | 1 no-vent heater | Hi water heater | Fireplace - Wood | Fireplace | 1 mini-hearth no-vent |
| | | | Furnace | Furnace | | |
| | | | Gas Grill | | | |
| Location of Leak | Middle of Gtrovl Space | Floor penetration in crawl space | In wall near entrance @ meter | | At fireplace flame | Under table in middle |
| Gas | LP | Nat | Nat | Under Table | LP | Nat |
| | | | | LP | | |
| Comments | Tree struck in yard near LP tank | Arc to tree ground add'l copper | Tree exterior wall - Arc to interior stone wall - no sleeve | Arc to table lamp - flame - fireplace not bonded | Arc to fireplace flame - fireplace not bonded | Leak did not appear does any mid |

Table 1 – Observations – All Sites

| Site No. | Appliance | Appliance Bonded | TracPipe Bonded |
|---|---|---|---|
| 1 | 1 mini-hearth no-vent no blower | NO | NO |
| 2 | 1 no-vent heater no blower | NO | NO |
| 6 | 1 mini-hearth no-vent no blower | NO | NO |

Table 2 – Gas Appliances Supplied by TracPipe without Electric Connection

**TracPipe**

OMEGAFLEX, INC., 451 Creamery Way, Exton, PA  19341-2509
Voice: 800-355-1039 or 610-524-7272  Fax: 610-524-7282  URL: www.omegaflex.com

CONFIDENTIAL ATTORNEY EYES ONLY

Confidential:
Attorney's Eyes Only

OMG 00002

MOOC 00319



# ΩmegaFlex

*Manufacturer of Flexible Metal Hose Products*

ENGINEERING PROJECT REPORT – EPR 2000-10

*An Investigation of Field Failures*

*Attributed to Possible Lightning Strikes*

---

## 6. ANALYSIS

Various failed samples that were returned from the field were sectioned and examined for any indication of electrical discharge. All of the samples exhibited a burn or melt through the wall. The size of the hole ranged from 1/32" to 1/16" in diameter. Micrographs show enlarged grains at the boundary of the hole, this indicates a significant temperature increase at that location.

## 7. CONCLUSION

All of the available evidence indicates that the field failures were caused by a near by lightning strike. In turn, this created a potential between the Tracpipe® and any metallic structure in close vicinity. Since the underground piping was isolated from the rest of the system, and the Tracpipe was not bonded, this created a floating ground and when the lightning strike occurred, the electric potential took the path of least resistance.

The requirements for isolation, grounding and bonding are dictated from the following specifications.



### TracPipe
OMEGAFLEX, INC., 451 Creamery Way, Exton, PA· 19341-2509
Voice: 800-355-1039 or 610-524-7272  Fax: 610-524-7282  URL: www.omegaflex.com

CONFIDENTIAL ATTORNEY EYES ONLY

Confidential:
Attorney's Eyes Only

OMG 00003

MOOC 00320

 

Manufacturer of Flexible Metal Hose Products

ENGINEERING PROJECT REPORT – EPR 2000-10

*An Investigation of Field Failures*

*Attributed to Possible Lightning Strikes*

## 8. RECOMMENDATIONS

It is recommended that a licensed electrician bond all Tracpipe installations, per page 18, Chapter 3 of the design and installation guide, dated October 1999.

Bonding is a requirement of NFPA 70, which must be followed for all gas piping materials including CSST.

Written By:  Dean W. Rivest
Senior Manufacturing and Project Engineer
OmegaFlex, Inc

Approved By:  Mark Albino
Senior Vice President Manufacturing and Engineering
OmegaFlex, Inc

**TracPipe**

OMEGAFLEX, INC., 451 Creamery Way, Exton, PA 19341-2509
Voice: 800-355-1039 or 610-524-7272  Fax: 610-524-7282  URL: www.omegaflex.com

CONFIDENTIAL ATTORNEY EYES ONLY

Confidential:
Attorney's Eyes Only

OMG 00004

MOOC 00321